### PEORIA TARGET CO. v. CLEVELAND TARGET CO. et al.

(Circuit Court of Appeals, Sixth Circuit. August 1, 1893.)

### No. 40.

1. PATENTS FOR INVENTIONS—REISSUES—WHEN ALLOWED.
   The commissioner of patents is without power to grant a reissue unless it shall clearly appear that the original patent was defective and inoperative for the invention intended; that this defect and inoperativeness arose through inadvertence and mistake; and, finally, that the patentee had not, by lapse of time and laches, abandoned his right to have the correction made.

2. SAME—OPERATIVE ORIGINAL PATENT—CHARACTER OF NEW CLAIMS.
   A reissued patent is void if it shall appear from an examination of the old and the new patents that the old patent was not defective or inoperative, but was for a complete invention, and that the reissue was taken out to secure another and different invention lurking in the mechanical arrangement of parts. Parker & Whipple Co. v. Yale Clock Co., 8 Sup. Ct. Rep. 38, 123 U. S. 87, followed.

3. SAME—INADVERTENCE AND MISTAKE — COMMISSIONER'S ACTION —WHEN REVIEWABLE.
   The action of the commissioner of patents in granting a reissue is conclusive upon the question of the existence of inadvertence, accident, or mistake, if there is any evidence before him tending to show such accident, inadvertence, or mistake as will, in law, warrant a reissue; but if the records show that there was no such evidence before him, or that there was record evidence, of a conclusive character, showing that there could have been no accident, inadvertence, or mistake, the reissue is void. 47 Fed. Rep. 728, affirmed. Huber v. Manufacturing Co., 13 Sup. Ct. Rep. 603, 148 U. S. 270, and Mahn v. Harwood, 5 Sup. Ct. Rep. 174, 6 Sup. Ct. Rep. 451, and 112 U. S. 354, followed.

[1] No opinion filed.

**4. SAME—TARGET TRAPS.**

Claims 3 and 4 of reissued letters patent No. 10,867, granted September 13, 1887, to N. G. Moore, administrator of Charles F. Stock, covering a target-throwing trap which has the target-holding device pivoted to the end of the throwing arm, so as to give it, by centrifugal force, an independent, rotary motion, thus causing the target to spin in the air so as to have an even flight, are void for want of proof that, through inadvertence and mistake, this invention was omitted from the specifications and claims of the original patent, No. 295,302, issued to Stock March 18, 1884, which covered merely a novel device adapted to retain the target during the swing of the arm, and to release it at the proper time for causing it to be properly projected into the air; the proofs given being merely to the effect that Stock was much dissatisfied with his patent, when first received, and it appearing that neither he, nor those interested with him in the patent, made any attempt to procure a reissue until after they had seen the subsequent Marqua patent, No. 301,908, which covered, substantially, the invention claimed in the reissue. 47 Fed. Rep. 728, affirmed.

**5. SAME—INFRINGEMENT.**

The first claims of the original and reissued Stock patents, which cover the "combination with the throwing arm of a target-throwing device, of a clip for holding the target, arranged to automatically drop below the upper surface of the throwing arm for releasing the target," are not infringed by a trap made under letters patent No. 322,714, issued July 21, 1885, to Albert A. Hebbard, in which the centrifugal power arising from the motion of the throwing arm overcomes the resistance of a spring which actuates one arm of the clamping device, thus gradually releasing the target. 47 Fed. Rep. 728, affirmed.

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

In Equity. Suit by the Peoria Target Company against the Cleveland Target Company and others for infringement of a patent. There was a decree in the court below for complainant, (43 Fed. Rep. 922,) but on a rehearing the bill was dismissed, (47 Fed. Rep. 728,) and complainant appeals from the latter decree. Affirmed.

Statement by TAFT, Circuit Judge:

This is an appeal from a decree of the circuit court of the United States for the northern district of Ohio. The action below was for the infringement of a patent, and the recovery of profits and damages. The decree appealed from dismissed the bill. The bill was based on rights asserted under reissued letters patent No. 10,867, granted September 13, 1887, to N. Grier Moore, administrator of the estate of Charles F. Stock, deceased, for a new and improved device for throwing targets, of that class known as "clay pigeon and ball traps." The original patent was issued to Charles F. Stock, was numbered 295,302, and was dated March 18, 1884. It was granted on an application which was filed December 28, 1883. The application for a reissue was filed on March 27, 1885.

The bill averred that prior to March 18, 1884, Charles F. Stock was the true, original, and first inventor of certain new and useful improvements in ball traps; that he made application for letters patent, and that a patent was accordingly issued to him on March 18, 1884, numbered 295,302; that afterwards, on June 4, 1884, he sold an undivided half interest in the invention to the Isaac Walker Hardware Company, and that afterwards, on October 28, 1884, Stock died at Peoria, in the state of Illinois; that N. Grier Moore was appointed his administrator on December 13, 1884, and that Moore, by virtue of an order of the probate court, assigned all his interest in the improvement and patent, and to any extension or reissue thereof, to Edward H. Walker, and that this assignment was concurred in and signed by Elizabeth Stock, widow of Charles F. Stock, and was duly recorded; and that subsequently all the owners of this patent and its reissue assigned the same to the

Peoria Target Company. The bill further avers that said original patent being found inoperative and invalid, by reason of a defective and insufficient specification, which defect and insufficiency had arisen by reason of the inadvertence, accident, or mistake, and without any fraudulent or deceptive intention on the part of said Charles F. Stock, the inventor, was by his administrator, and with the consent of the said Isaac Walker Hardware Company, surrendered to the commissioner of patents, and an application was made for a new patent to issue for the same invention, which application was granted. The bill then avers: "And your orator shows unto your honors that for a long time prior to his death the said Charles F. Stock was in very poor health, at times unable to transact any business whatever; that your orator is informed, and believes it to be true, that shortly after the granting of the aforesaid original letters patent, and long before his death, said Stock discovered the many errors, inadvertences, and insufficiencies of the said letters patent, rendering the same inoperative or invalid as aforesaid, and that said Stock thereupon, and without delay, sought the advice of legal counsel thereon, and took steps to apply for a reissue thereon; that such application for reissues was delayed by reason of the illness of said Stock, his subsequent death as aforesaid, and by the delay in the administration of his estate, and without any fraudulent or deceptive intent; and that your orator is informed and believes that no other person, firm, or corporation, not acting under authority of said Stock or his assigns, ever began the manufacture, sale, or use of any target-throwing traps containing or embodying the said improvements or said invention until long after said Stock had sought legal counsel, and taken steps towards reissuing said original letters patent upon a corrected and amended specification as aforesaid." The bill then charges the defendants with infringement, and prays for an injunction and damages. The answer denies that Stock was the original inventor of the improvements covered by the original letters patent; denies that the original letters patent were inoperative or invalid by reason of any insufficient or defective specification, or that such insufficiency or defect arose through inadvertence, accident, or mistake and without any fraudulent or deceptive intention; avers that the surrender and application for a reissue were made solely for the purpose of securing in said reissued patent broader claims than were contained in said original patent; and that the alleged invention claimed in and by the new and broadened claims of said reissued letters patent were shown and described, prior to the application for said reissued patent, in two patents to Marqua, and in one to N. Grier Moore, the administrator of the estate of Charles F. Stock. The answer denies the statements concerning the decline in health of Stock prior to his death, and his inability to transact business. The answer denies infringement, and asks a dismissal of the bill.

The evidence in the case, raised several issues. One was as to whether Stock was the first inventor of the device claimed in the reissue. Another was as to whether the defendants infringed the claims of the reissued patent. The only issues which the court found necessary to consider, however, were—First, the validity of the reissue; and, second, whether the defendants infringed the first claim of the reissued patent, which was substantially the same as the first claim of the original patent.

As already stated, the original and reissued patents sued on relate to target traps. The target used is dish-shaped, with a rim on the exterior circumference. It is thrown by an arm swinging upon a center, and given impulse by a strong spring. Stock's invention consisted in a novel device at the outer end of such throwing arm for holding the target, adapted to release the target at the proper time so that it might be properly projected into the air. The device consisted of a short arm or carrier connected with the throwing arm by a two-way joint. The target was placed over this short arm or carrier, and was held in place by an upward projection on the carrier in front of its outer rim. The carrier and the target upon it were in the plane of the throwing arm, but before the trap was sprung the carrier was at right angles to the throwing arm. As the throwing arm swung upon its center, it carried the target with it; and the centrifugal force caused the short arm or carrier, with the target upon it, to swing about on its pivot connection into line with the throwing arm. When it reached this position, the upward projection upon the carrier dropped below the plane of the throwing arm away from in front

of the rim of the target, and the latter, being free, flew off into the air. The office of the two-way joint, as explained in the original patent, was to permit the motion of the target from a position at right angles with the throwing arm to a position in line with it, which motion would cause the target-holding projection or button automatically to drop below the plane of the throwing arm, and release the target.

The original patent disclosed six different varieties of the device for releasing dish-shaped targets, and one for releasing a ball target, in each of which the mode of release was different, but in all of which the target was held by a piece at right angles to the plane of the carrier and throwing arm, and was released by the dropping of that piece below the plane of the carrier and throwing arm automatically. In the original patent it was stated that the invention, which was a releasing device, was intended to release the target at the proper time so that it might be properly projected into the air. In the reissued patent it was said that the invention, which was a pivoted carrier, was intended to give a more even flight to the target, by imparting to it, as it left the trap, a rotary impulse or axial rotation in addition to that which it received from the throwing arm. The third and fourth claims of the reissued patent are based on the feature just stated, which feature is not mentioned in the original patent. The drawings are not changed in the reissued patent, and appear exactly as they did in the original. The specifications are changed. That a fuller understanding between the old and the new patent may be had, the old specifications and the new are given below in parallel lines, followed by the drawings which are applicable to both patents, and which were not changed in the reissue:

|  Original. | Reissue. |
| --- | --- |
| Be it known that I, Charles F. Stock, of Peoria, in the county of Peoria and state of Illinois, have invented a new and improved device for throwing targets, of which the following is a full, clear, and exact description: | Be it known that Charles F. Stock, deceased, late a resident of Peoria, in the county of Peoria, and the state of Illinois, did invent a new and useful device for throwing targets, and I, N. Grier Moore, administrator of the estate of said Charles F. Stock, do hereby declare that the following is a full, clear, and exact description thereof: |
| This invention relates to that class of target-throwing devices known as "clay-pigeon and ball traps," wherein a throwing arm swinging upon a center is employed, and the invention consists in the employment of a novel device at the outer end of the throwing arm for holding the target; the same being adapted to retain the target during the swing of the arm, and to release it at the proper time for causing it to be properly projected into the air. | This invention relates to that class of target-throwing devices known as "clay-pigeon and ball traps," wherein a pivoted swinging or throwing arm is employed to project the target into the air, to be shot at by marksmen. |
| | The object of the invention is to produce a trap capable of giving a more even flight to the target than is attained from the traps now in use, by imparting to the target, as it leaves the trap, an impulse or motion independent of that which it receives from the throwing arm thereof; and the invention consists in providing the end of the swinging or throwing arm with a device for holding the target during the swing or throw of the arm, in securing this device to the arm so as to permit an independent, rotary movement of the device on the arm, and in providing automatic means or mechanism on the throwing arm for releasing the target. |
| Reference is to be had to the accompanying drawings, forming part of this specification, in which similar letters of reference indicate corresponding parts in all the figures. | The invention will be better understood by reference to the accompanying drawings, which form a part of this specification, in which similar letters of reference indicate like parts. |
| Fig. 1 is a perspective view of a target-throwing device having one form of my new target-holding plate or clip applied thereto, showing in full lines the target-holding clip in the position it occupies when the target is placed in the | In the drawings, Fig. 1 is a perspective view of a target-throwing device having one form of the new target-holding plate or clip applied thereto, showing in full lines the target-holding plate or clip in the position it occupies |

trap, ready to be thrown, and in dotted lines the position it assumes at the time of releasing the target. Fig. 2 is a sectional elevation of the outer end of the throwing arm, showing the construction and arrangement of the clip. Figs. 3 and 4 show, respectively, in plan and side elevation, a modified form of clip, wherein a spring is used. Fig. 5 shows, in side elevation, another form of clip, wherein a spring is used. Fig. 6 is a perspective view of a clip arranged without a spring, and Fig. 7 is a perspective view of a clip for throwing glass balls or other targets having small orifices.

A is the throwing-arm of the trap, to the outer end of which arm my new clip, B, is hinged. The arm, A, is secured to the pulley, C, which is operated by pulling upon the cord, D, for rapidly swinging the arm, A, from the position shown in full lines in Fig. 1 (where it is retained by the tension spring, E) to that shown in dotted lines, for throwing the target into the air. The clip, B, is composed of the bent plate, a, which carries the rubber block, b, and has hinged to its under side the tongue, c, by which the clip is hinged to the outer end of throwing arm, A, in the slot, d, thereof upon the pin, c. The tongue, c, is beveled or brought to a point at its lower end, and against its lower pointed end impinges the bent end, f', of the friction spring, f, secured to the lower side of the arm, A, as shown clearly in Fig. 2. The pressure of the spring, f, upon the lower end of the tongue, c, may be regulated by the screw, g. When the clip, B, is arranged for use the tongue, c, will be brought to the position shown in dotted lines in Fig. 2, where it will be held with considerable force by the spring, f. The plate, a, will then be swung around upon the swivel or hinge pin, a², so that the block, b, will stand parallel with the arm, A, as shown in full lines in Fig. 1.

The arm, A, will now be "set," that is, swung back, so that the stud, a', thereof, will be engaged by the tension spring, E. The target, F, which is a cupped clay target, (shown in dotted lines,) will then be placed upon the weighted portion, A', of the body, B', of the target against the lip, C', and over the block, b, or lip of the clip, as illustrated in Fig. 1. Now, upon pulling upon the cord, D, the arm, A, will be detached from the tension spring, E, and swing rapidly to the position shown in dotted lines in Fig. 1, where it will be suddenly stopped by the reverse action of the cord, D, upon the pulley, C. As the arm, A, swings around, the target, F, will be carried with it, being held by the clip, B. The

when the target is placed on the trap ready to be thrown, and in dotted lines the position it assumes at the time of releasing the target. Fig. 2 is a sectional elevation of the outer end of the throwing arm, showing the construction and arrangement of the clip. Figs. 3 and 4 show, respectively, in plan and side elevation, a modified form of clip, wherein a spring is used. Fig. 5 shows, in side elevation, another form of clip, wherein a spring is used. Fig. 6 is a perspective view of a clip arranged without a spring, and Fig. 7 is a perspective view of a clip for throwing glass balls or other targets having small orifices.

The letter A represents the throwing arm of the trap, to the outer end of which the new clip, B, is pivoted or hinged. The arm, A, is secured to the pulley, C, which is operated by pulling on the cord, D, so as to rapidly swing the arm, A, from the position shown in full lines in Fig. 1 (where it is retained by the tension-spring, E, when the trap is "set") to the position illustrated in dotted lines in said Fig. 1. The clip, B, is composed of the bent plate, a, which carries the rubber block, b, and is secured by the pivot or pin, a', to the upper end of the tongue, c, so as to easily swing or turn thereon. The tongue, c, is pivoted or hinged in the slot, a², in the end of the arm. A, by the pin, c'. The bent end, f', of the friction spring, f, presses against the lower and pointed end of the tongue, c, and the screw, g, regulates the tension thereon. The arm, A', is secured rigidly to the standard, A², of the trap, and is provided with weighted portion, a⁴, having a projecting lip, a⁵, against which the targets are placed when "setting" the trap. The spring, E, is secured to the arm, A, so as to engage the pin or lug, a², on the arm, A.

To set the trap, the clip or holder, B, is brought in the position illustrated in Fig. 1, the tongue, c, turning vertically on its hinge pin or pivot, c', and the plate, a, is swung around on the pivot, a', so as to bring the rubber block parallel to the arm, A. The arm, A, is now set; that is, swung back so that the lug or pin, a², thereof, will engage the spring, E. The target, F, which is usually cup or dish shaped, (shown in the drawings in dotted lines in Fig. 1,) will then be placed on the weighted portion, a⁴, of the arm, A, against the lip, a⁵, and over the block, b, of the clip, B.

The target is thrown by pulling on the cord, D, which causes the arm, A, to disengage the spring, E, and to swing around to the position illustrated in dotted lines in Fig. 1, where it will be suddenly stopped by the reverse action of the cord upon the pulley, C. As the arm swings around, the target, F, will be carried with it, being held by the clip, B. The centrifugal force of

centrifugal force of the target, imparted by the rapid swinging of the arm, A, will gradually turn the plate, a, upon the hinge pin, a², as the arm, a, proceeds, until the direction of the centrifugal force comes in line with the slot, d, in the outer end of the arm A, whereupon the lower end of the tongue, c, will be forced back of the friction spring, f, which will permit the plate, a, to drop down to the position shown in full lines in Fig. 2, and in dotted lines in Fig. 1, and thus release the target. The slot, d, being made in the line of the length of the arm, A, it will be seen that the clip, B, will not release the target until the arm, A, reaches the end of its swing, so that the target will receive all of the propulsive force of rapid swinging of the arm, save that which is lost in overcoming the friction of the spring, f.

In the form of clip shown in Figs. 3 and 4, instead of hinging the main plate, a, to the tongue, c, and providing the plate with a block of rubber, I attach the plate rigidly to the tongue, c, and pivot upon the plate the button, h, which turns with the centrifugal force of the target, and releases the target at the proper time by the dropping of the main plate to an inclined position at the end of the sweep of the arm, A, of the same, as in the form of clip shown in Figs. 1 and 2; the tongue, c, turning in slot, a, against the action of the spring, f. In place of the button, h, a plain stud might be used with good results; but with the button there is no danger of breaking the rim of the target, as might be the case with the stud.

In the form of clip shown in Fig. 5, the target is held to the throwing arm, A, by the plate, j, attached to the upper end of the bolt, k, which passes through the arm, A, and has the coiled spring, l, placed upon it, so as to act between the under side of the arm, A, and the nut, i, on lower end of said bolt, k. In the upper side of the arm, A, is formed the transverse slot, m, into which the spring, l, suddenly draws the plate, j, when the target is to be released. In setting this form of clip, the plate, j, will be lifted out of the slot, m, against the tension of the spring, l, and turned across the slot, m, parallel with the length of the arm, A, and the rim of the target will be placed over the plate, j, as over the button, h, and block, b, in the forms of clips above described. As the arm, A, swings around, the centrifugal force of the target will turn the plate, j, until it comes parallel with the slot, m, whereupon the spring, l, will draw it quickly into the slot, m, and thus release the target.

the target, imparted by the rapid swinging of the arm, A, causes the plate, a, to turn on the pivot, a', as the arm, A, proceeds until the direction of the centrifugal force comes in line with the slot, a³, in the end of the arm, A, whereupon, by the sudden stopping of the arm, the lower end of the tongue, c, will be forced past the friction spring, f, and, turning on its hinge or pivot, c', will permit the clip, B, to drop down into the position illustrated in full lines in Fig. 2, and in dotted lines in Fig. 1, and thus release the target.

The slot, a³, being in the line of the length of the arm, A, it will be seen that the clip, B, will not release the target until the arm, A, reaches the end of its swing or throw, so that the target will receive all the propulsive force of the rapid swinging of the arm, save that which is lost by overcoming the friction of the spring, f.

In the form of clip shown in Figs. 3 and 4, instead of pivoting the main plate, a, to the tongue, c, and providing the plate with a block of rubber, the plate, a, is attached rigidly to the tongue, c, and the button, d, is pivoted on the plate, a, at a', which button turns with the centrifugal force exerted, and releases the target at the proper time by the dropping of the main plate to an inclined position at the end of the throw or swing of the arm, A; the tongue, c, turning in the slot, a³, against the spring, f, as in the forms of clip described and shown in Figs. 1 and 2. In place of the button, d, a plain stud might be used with good results, but with the button there is no danger of breaking the rim of the target, as might be the case with the stud.

In the form of clip shown in Fig. 5, the target is held to the throwing arm, A, by the plate, h, attached to the upper end of the bolt, h', so as to turn or swing thereon. This bolt passes through the slot, a⁴, in the end of the arm, A, and has a coiled spring, i, placed upon it, so as to act between the under side of the arm, A, and the nut, i', on the lower end of the said bolt, h'. In the upper part of the arm, A, is the transverse slot, a³, into which the spring, i, suddenly draws the plate, h, when the target is to be released. In setting this form of clip, the plate, h, will be lifted out of the slot, a³, against the tension of the spring, i, and turned across the transverse slot, a³, parallel with the length of the arm, A, as shown, and the target will be placed over the plate, h, as over the button, d, and block, b, in the forms of clips above described.

As the arm, A, swings around, the centrifugal force of the target will turn the plate, h, until it comes parallel with the slot, a³, whereupon the spring, i, will draw it quickly into the slot, a³, and thus release the target.

In the form of clip shown in Fig. 6, the target 's held to the throwing arm, A, by the block of rubber, b, held in the bent plate, o, which is hinged to the plate, p, pivoted upon the upper side of the arm, A. To the under side of the arm, A, is secured the slotted plate, q, the slot of which coincides with the slot, d, made in the arm, A. The edge of the plate, q, is rounded, and projects beyond the sides and end of the arm, A, as shown at q', and the under side of the bent plate, o, is formed or provided with the toe, o', which is adapted to rest against the outer edge of the plate, q, as shown, for holding the bent plate, o, and the rubber block, b, in position parallel with the arm, A, for receiving and holding the target. The edge of the target to be thrown will be placed, as in the other forms, over the block, b, which will hold the target until its centrifugal force swings the plates, p and o, around in line with the slot, d, in the arm, A, and the slot in the plate, q, whereupon the toe, o', will drop into the said slots, and permit the plate, o, and block, b, to drop to an inclined position, and thus release the target.

The form of clip shown in Fig. 7 is, to all intents and purposes, like that shown in Fig. 6, except that in place of the bent plate, o, and rubber block, b, the plate, p, has hinged to it the small toeplate, s, which is formed or provided with the pin, t, which is adapted to have placed upon it glass balls or other targets having small orifices suitable to receive the said pin. The pin, t, by means of the plate, q, and toe, o', is held in vertical position when the plate, p, is turned at right angles to the throwing arm, A, as shown, in which position it will hold the glass-ball target, and will continue to hold the same during the swinging movement of the arm, A, until the centrifugal force of the target swings the plate, p, around so that the toe, o', coincides with the slot in the plate, q, and the slot, d, in the arm, A, whereupon the pin, t, will drop to a position nearly parallel with the arm, A, and thus release the target.

Having thus described my invention, what I claim as new and desire to secure by letters patent is:

(1) The combination with the throwing arm of a target throwing device of a clip for holding the target, arranged to automatically drop below the upper surface of the throwing arm for releasing the target, substantially as described.

(2) The target-holding clip, consisting of the pivoted plate, p, having the plate, o, provided with toe, o', hinged to it, in combination with the slotted

In the form of clip illustrated in Fig. 6, the plate, a, is pivoted by the pin, a', directly to the end of arm, A, and to this plate, a, is hinged at c' the bent plate, e, which carries the block, b, over which the target is placed, as in the form first above mentioned. To the under side of the arm, A, is secured a plate provided with a slot coinciding with the slot, a³, in the arm, A. The edge of the plate which projects beyond the sides and end of the arm, A, is made rounding, as shown at a⁶, and the under side of the bent plate, e, is directly to the end of arm, A, and to provided with a tongue or projection, e², which rests against the outer edge, a⁶, of the plate, as shown, and thus holds the bent plate, e, and the rubber block, b, in position parallel with the arm, A, for receiving and holding the target.

The target to be thrown will be placed, as in the other forms, over the block, b, which will hold the target until, by centrifugal force, the plates, a and e, are swung around in line with the slot, a³, whereupon the toe or projection, e², will drop into the slot, W, and permit the plate, a, and block, b, to drop back into the inclined position, and thus release the target.

The form of clip illustrated in Fig. 7 is designed for glass balls or other targets having small orifices, and is substantially like the form last described, with this exception, viz.: The plate, e, is made smaller; the rubber block is not used, and in its place is used the pin, j, adapted to fit into the small orifices or openings in glass balls or other targets. The operation of this form is similar to that just described.

Having described the invention, what I claim as the invention of the said Charles F. Stock is as follows:

(1) The combination with the throwing arm of a target-throwing device of a clip for holding the target, arranged to automatically drop below the surface of the throwing arm for releasing the target, substantially as described.

(2) The target-holding clip, consisting of the plate, a, having the plate, e, provided with the toe, e², hinged to it, in combination with the slotted plate, a⁶,

plate, q, all adapted to be operated substantially as described.

Charles F. Stock.

Witnesses:
   H. A. West.
   Edgar Tate.

all adapted to be operated substantially as described.

(3) In a trap or sending apparatus for flying targets, a throwing arm provided with a pivoted extension or target carrier, which, by the motion and arrest of the arm, is independently rotated on its pivot by centrifugal force into a position elongating said arm to project the target, substantially as specified.

(4) In a trap or sending apparatus for flying targets, a sending or throwing arm having a pivoted clip carrying the target, said arm being provided with means for automatically releasing the target at the extreme extension of the arm, as and for the purpose specified.    N. Grier Moore, Administrator of the Estate of Charles F. Stock, Deceased.

Witnesses:
   Frank Jack,
   W. E. Coe.

Fig. 1.

Fig. 2.

Fig. 3.

Fig. 4.

Fig. 5.

Fig. 6.

Fig. 7.

The two affidavits upon which the reissue was obtained were as follows:

"State of Illinois, County of Peoria—ss.

"N. Grier Moore, the above-named petitioner, being duly sworn, deposes and says that he verily believes that the aforesaid letters patent, granted to Charles F. Stock, deceased, are inoperative, by reason of a defective and insufficient specification; that the statement of the invention on page one (1) of said specification contains no mention of the real invention, to wit, a pivoted carrier, as shown in the drawings, and described throughout the specification; that the description is not accurate; the 'clip, B,' is said to be hinged in one place, and swiveled in another, and is shown to be pivoted; that the claims do not point out the real invention, to wit, the pivoted feature; that at the time of preparing the original application, and for some time prior thereto, the said Charles F. Stock was in very poor health, and deponent is informed and believes that while in New York city, consulting with his old solicitors, Messrs. Munn & Co., the said Stock was attacked by the disease which afterwards caused his death; that for several days during his visit in New York city he was unable to attend to business at all, and that he was never, while there, able to devote much of his time or attention to the preparation of his application; that he explained his said invention to his said solicitors fully and completely, but when the said application was presented to him for signatures at his home, in Peoria, he was unable at that time to revise the work of his solicitors; that he was in such poor health that he was scarcely able to even read the papers, and he signed them, thinking they were prepared as he directed them to be; that after returning his application papers, properly executed, to his solicitors, Munn & Co., the said Stock did not see the application nor the claims until the patent was issued; that he discovered the errors and insufficiencies therein contained, and prepared to obtain a reissue thereof correcting said defects; that he consulted his attorney about this reissue application, but owing to his ill health he was unable to proceed; that the said Charles F. Stock died on or about the 28th day of October, A. D. 1884; that affiant verily believes said Charles F. Stock to be the original, first, and sole inventor of the invention set forth and claimed in the foregoing amended specification; that the said errors and defects in the patent aforesaid arose by inadvertence and mistake, and without any fraudulent intent, and, as administrator of the estate of said Charles F. Stock, affiant is the owner of an undivided one-half interest in said letters patent.                               N. Grier Moore.

"Subscribed and sworn to before me this 18th day of March, A. D. 1885.
       [L. S.]                            "Douglas A. Myers, Notary Public.

"State of Illinois, County of Peoria—ss.

"Fred Kimball, being of lawful age, deposes and says that he is a resident of the city of Peoria, in the county and state aforesaid; that he was well acquainted with one Charles F. Stock, late a resident of Peoria, and now deceased; that he was in company with the said Stock in New York city in the latter part of the year 1883; that the object of the visit of the said Stock to New York city at that time was the preparation of an application for letters patent for the invention which was afterwards granted to the said Stock, in letters patent of the United States numbered 295,302, dated March 18, 1884; that while in New York city the said Stock was attacked by the disease which afterwards caused his death; that the said Stock explained his invention, and all parts thereof, to his solicitors, Messrs. Munn & Co., and instructed them to prepare the application, and forward it to him at his home, in Peoria, to which he returned at once on account of his sickness; that, when said application papers arrived at Peoria, affiant knows that the said Stock was in extremely poor health, and so sick as to be scarcely able to read them over; and that the said Stock made the remark, while looking over the papers, that he 'doubted if he should be able to get through with them;' that he did not examine them carefully, affiant knows, but that the said Stock executed the papers under the impression that they fully described and claimed his invention, as he had explained it to his solicitors, and

that when the said patent issued said Stock discovered many errors and insufficiencies therein, and proceeded to consult an attorney as soon as his health permitted, looking towards a reissue of the patent on an amended and corrected specification; that before said papers were fully prepared the said Charles F. Stock died, to wit, on or about the 28th day of October, A. D. 1884.                                                  Fred Kimball.

"Subscribed and sworn to before me this 18th day of March, A. D. 1885, at Peoria, Illinois.
[L. S.]                                    "N. Grier Moore, Notary Public."

On April 11, 1884, Phillip Marqua filed an application for a patent ball trap, and on the 15th of July, 1884, letters patent 301,908 therefor were issued to him. In his specifications he stated that the object of his patent was to render the ball trap more efficient, and to produce a more even flight of the target, and also to adapt the same to the sending of a tongueless target. The specifications continued: "Such traps, as at present used, employ a pivoted arm carrier, the target usually secured thereto by a tongue, and by the partial rotation of the arm upon its pivot, and the sudden arresting of its movement, the target is projected into the air with an independent, rotary motion. The flight thus imparted is not always uniform or satisfactory, but may be rendered so by imparting to the target a sudden impulse at the instant of projection independently of the carrying arm. One of the objects of my invention is to produce a trap capable of imparting this sudden and independent impulse; and, to this end, it consists in mounting upon the main sending arm an independent, pivoted carrier, which by the movement of the arm, and at the instant of arrest, is swung around upon its pivot by its own centrifugal force, and suddenly thrown into line with the main arm, as an extension thereof, releasing the target at the culmination of the instantaneous independent impulse, which imparts additional force both in projection and rotation. This feature of my invention may be independently used with traps adapted to targets either with or without tongues."

The first two claims made by Marqua were as follows:

"(1) In a trap or sending apparatus for flying targets, a sending arm provided with a pivoted extension constituting the target carrier, which, by the motion and arrest of the sending arm, is independently rotated upon its pivot by centrifugal force into a position elongating the main arm, and projects the target by a sudden rotary impulse, substantially as set forth.

"(2) In a trap or sending apparatus for flying targets, a sending arm provided with a pivoted extension carrying the target, and having an independent rotation by centrifugal force, in combination with target holding and releasing mechanism automatically actuated to release the target at the moment of extreme tension of the sending arm, substantially as set forth."

The specifications and the new claims in Stock's reissued patent were drawn by Taylor E. Brown, the solicitor of Stock, and of Moore, his administrator, and of the plaintiff company herein, after he had read the specifications and claims, in July, 1884, of the foregoing Marqua patent. On October 13, 1884, Stock filed an application for a patent trap for throwing targets, which afterwards resulted in the issue of letters patent 322,020, on July 14, 1885. This patent showed a pivoted carrier which released the target automatically by the use of a cam in the holding apparatus. The two claims in the original specifications were:

"(1) In a trap for sending or throwing targets, a clamping device, pivotally secured to the end of the sending arm, provided with mechanism to automatically release the target, substantially as specified.

"(2) In a trap for sending or throwing targets, a clamping device, pivotally secured to the end of the throwing arm, provided with mechanism to automatically release the target, and also with means for imparting to said target a positive axial rotation as it leaves the trap, substantially as specified."

These claims were rejected on the ground that they had been anticipated by the Marqua patent, just referred to, and their rejection was finally acquiesced in by the administrator of Stock, and this claim accepted instead: "In a trap for throwing targets, the target-clamping device herein shown and described, pivoted at or near the end of the throwing arm of a trap, in combination with

a double or two-faced cam formed on the end of said arm, and a depending projection or pin on the clamping device, which bears against the cam during the swing of the clamping device, releasing the same by its escape from the cam, and thereby allowing the target to escape, substantially as set forth." As already stated, this application was made on the 13th of October, 1884. This was rejected on the 28th of October, 1884, on the ground that claims 1 and 2 were functional, and, in substance, were anticipated by the Marqua patent. An amendment was filed on the 20th of February, 1885, which amendment was rejected on the 24th of that month. An amendment was filed on the 2d of March of claims 1 and 2, which was rejected on the 10th of March, 1885. On the 17th day of March, 1885, the application for the reissue with the new claims under the old patent of Stock was filed.

The defendant's target trap was based on the patent of Albert H. Hebbard, of Knoxville, Tenn., letters patent 322,714, patent granted July 21, 1885, and the application for which was filed May 19, 1885. The character of the patent may be seen from the following drawings, which are taken from Hebbard's specifications:

*Fig 1.*

*Fig. 2.*

*Fig. 3.*

"B is an arm pivoted at the outer end of the arm, A, and connected with the latter by means of a spring, C, which enables the arm, B, to swing from its normal position at an angle of ninety degrees (more or less) to the said

arm, A, to a position of one hundred and eighty degrees (more or less) to the latter. The end of the arm, B, is bifurcated, as shown at D, forming an upper and a lower prong, denoted, respectively, by letters E and F. To the said arm, B, is also hinged or pivoted a third arm, G, having a pivoted rod, H, extending through a transverse perforation, I, in the arm, B, and the outer end of which is provided with a nut, J, between which and the said arm, B, is arranged a coiled spring, K, whereby the said arm, G, is automatically drawn toward the arm, B, as will be seen in Fig. 2 of the drawings. The arm, G, is provided with a vertical pin or stud, L, which may be adjusted in any one of a series of perforations, M, M, in the said arm; and it is also provided at its outer end with an additional pin or stud, N, either stationary or arranged to revolve in its bearing, and having a sleeve or covering of rubber, leather, or other suitable material, as shown at O. P. designates a target adapted to be used in connection with a trap having my improved arm. The same consists of a concavo-convex or saucer-shaped disk, having an annular shoulder, Q, and an annular rim or flange, R." The operation of the trap is as follows: "The arms, B, G, are drawn apart against the tension of the spring, K, and the target is then inserted between the said arms in such a manner that its under side or edge shall rest upon the arm, G, and the lower prong, F, of the arm, B, the upper prong, E, of said arm being fitted in the shoulder, Q, of the target, while the rim, R, of said target will bear against the pins or studs, L, N, of the arm, G. When, in the act of discharging the trap, a swing motion is imparted with great force to the arm, A, the target will, by the centrifugal force thus generated, be discharged by its periphery rolling, as it were, upon or around the stud or stop, N, while the opposite side of its periphery slides between the prongs, E, F, of arm, B, thereby imparting the desired axial rotation to the target."

Lysander Hill and Poole & Brown, for appellant.

E. A. Angell, (J. H. Webster, on the brief,) for appellees.

Before TAFT, Circuit Judge, and BARR and SAGE, District Judges.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The reissue of the patent to the administrator of Stock is based on the ground that Stock intended to claim as the chief feature of his patent a pivoted carrier, without regard to any particular releasing device, so arranged that the rotary motion of the carrier, independent of the rotary motion of the swinging arm, would give to the target an additional axial rotation, which would prevent the target from "wobbling" in the air, and give it a sailing movement, like that of a bird.

The first question is, therefore, what must have appeared to the commissioner before he had authority to enlarge the claims in a reissue so as to include in them this feature? The mechanical parts of the device, as shown in the drawings, were not changed in the reissue. The change consisted in explanations in the specifications of the advantages of this pivotal connection between the carrier and the swinging arm, by which an independent, rotary motion was imparted to the target. The reissued patent also introduced new claims, embracing, in broad terms, such pivotal connection between the target carrier and the throwing arm. Section 4916 of the Revised Statutes provides:

"Whenever any patent is inoperative or invalid by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own in-

vention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the commissioner shall, on the surrender of such patent and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification, to be issued to the patentee, or, in case of his death or an assignment of the whole or any undivided part of the original patent, then to his executors, administrators, or assigns, for the unexpired part of the term of the original patent. * * *"

The supreme court of the United States has held that while this section, literally construed, would only authorize reissues to correct specifications or claims defective or inoperative because too broad, it would construe the section liberally to give the commissioner of patents power to grant a reissue to expand claims which had been made too narrow by reason of accident, inadvertence, or mistake, without fraud. But it has been held in a number of cases that the commissioner is without power to grant a reissue unless it shall clearly appear that the patent, as originally issued, was defective and inoperative for the invention intended; that this defect and inoperativeness arose through inadvertence and mistake; and, finally, that the patentee had not, by lapse of time and laches, abandoned his right to have the correction made. With respect to the proof of inadvertence, accident, or mistake, the action of the commissioner is conclusive, if there is any evidence before him tending to show such accident, inadvertence, and mistake as will, in law, warrant a reissue. With respect to whether the original patent is inoperative and defective, the court has always reserved the right to review the action of the commissioner. If it shall appear from an examination of the new and old patents that the old patent was not defective or inoperative, but was for a complete invention, and that the reissue was taken out to secure another and different invention lurking in the mechanical arrangement of parts, the supreme court has always held the reissue void. Parker & Whipple Co. v. Yale Clock Co., 123 U. S. 87, 8 Sup. Ct. Rep. 38. Again, if an examination of the patent-office record discloses that there was no evidence before the commissioner of accident, inadvertence, or mistake, such as to warrant him in reissuing the patent, or that there was record evidence, of a conclusive character, showing that there could have been no accident, inadvertence, or mistake, the supreme court has not hesitated to hold a reissue void. This is manifest from an examination of the decisions of that court. In the case of Huber v. Manufacturing Co., —the last case in which the supreme court has had occasion to consider the question of reissues,—148 U. S. 270, 13 Sup. Ct. Rep. 603, the supreme court expressly approved the language of Judge Thayer in the court below, to be found in Huber v. Manufacturing Co., 38 Fed. Rep. 836, where, considering the question of his power to review the action of the commissioner in granting a reissue, he said:

"All of the evidence that was before the commissioner, tending to show inadvertence and mistake, (such as the affidavit of the inventor and his solicitor, and other documents) was offered by the complainant in the present case, and

was supplemented by some additional testimony. Under such circumstances, I understand the law to be that the court may review the finding of the commissioner on the point that the original patent was inoperative by reason of inadvertence or mistake; at least, to the extent of determining whether, as a matter of law, what was described and alleged to be a mistake is such a mistake as will warrant a reissue."

Justice Bradley, in Mahn v. Harwood, 112 U. S. 354–362, 5 Sup. Ct. Rep. 174, and 6 Sup. Ct. Rep. 451, said that—

"Whenever it is manifest from the patent itself, compared with the original patent and cognate documents of record, or from the facts developed in the case, that the commissioner must have disregarded the rules of law by which his authority to grant a reissue in such cases is governed, the patent will be considered as void to the extent of such illegality. It is then a question of law, not a question of fact."

The fact which the commissioner of patents must have found, and which there must have been some evidence before him tending to show, was that when Stock filed his first specifications, knowing the additional advantage that would be obtained from the pivotal connection of the carrier with the swinging arm, because of the additional axial rotation of the target caused thereby, he intended to claim broadly such pivotal connection. If all that he had in mind as to the good result of the pivotal connection was the automatic releasing of the target at a particular time, and all that he intended to claim was the use of that pivotal joint between the carrier and the swinging arm, in connection with the other parts of the releasing device, because it was necessary to make operative his releasing device, then he was not entitled to a reissue to broaden his claims so as to include any pivotal connection between the carrier and the swinging arm, uncombined with his releasing device.

Therefore, the question now to be determined is whether there was any evidence before the commissioner of patents which justified him in holding that Stock, at the time he filed his original application, intended to claim, broadly, the device of a pivotal connection between the carrier and the swinging arm, without regard to the releasing device, which should give the target an additional axial rotation.

In the first place, the original patent shows no defect or inoperativeness on its face. The drawings, the specifications, and the claims show nothing but an improved device for releasing the target. The pivoted connection of the carrier with the swinging arm manifestly plays an important part in the releasing device, and there is not the slightest suggestion in the specifications or claims that it has any other function than that. It admits of serious doubt whether we ought not to hold that the reissue is so plainly for an invention different from that described and covered in the original that the reissue is void. Parker & Whipple Co. v. Yale Clock Co., 123 U. S. 87, 8 Sup. Ct. Rep. 38. It might be forcibly argued that the first patent was for a releasing device and the reissue was for a throwing device. The argument would be supported by the omission in the reissue of the word "gradually," found in the old

specification, where the movement of the carrier on the pivot is described. A gradual movement of the carrier would seem to be necessary to make the releasing device in Figs. 6 and 7 of the drawings work at all, whereas the independent pivotal movement of the carrier must be rapid to give any perceptible addition to the axial rotation of the target.

But we prefer to put our conclusion in this case on the absence of any evidence before the commissioner, upon which he could base a finding of an accident, inadvertence, or mistake in the required respects. It will be noted from what we have said that the original patent suggested nothing of the mistake claimed, on its face. What other evidence was there? There was first the oath of the administrator, who spoke on information and belief, and with no personal knowledge on the subject; and then there was the oath of Kimball, who was present with Stock in New York. Neither states that Stock intended to claim what was claimed in the reissue. This was indispensable. The fact that Stock was sick when he made his application, and the fact that he was not satisfied with the patent when issued, do not show that he intended to describe or claim that which was contained in the new specifications and claims, nor is there anything in the original application to show it. The evidence before the commissioner, as a matter of law, therefore, was insufficient to show the mistake or accident upon which, alone, he was entitled to reissue the patent.

If Stock had intended to claim what is now contained in the reissue, the failure of the first patent to include it must have been apparent to him, on inspection, and it is inconceivable that he should have delayed action in procuring a reissue. It is attempted to explain his delay by his illness, but it appears that after he received the original patent he made three different applications for other patents, with respect to which he consulted Munn & Co., in New York, and Taylor E. Brown, his patent solicitor, in Chicago. When he applied for the patent, and when he received it, there were others pecuniarily interested with him in it, whose interest would have prompted an immediate application for reissue, if the mistake was so apparent to him, and so easy of explanation. There was evidence adduced to the court below that Stock was disappointed in his patent, but there is an almost total absence of evidence tending to show that his disappointment arose from a failure to claim, broadly, a pivoted carrier, with a resulting addition to the target's axial rotation.

In his examination in chief in the court below, Kimball, the president of the Peoria Target Company, who went with Stock to New York for the purpose of obtaining the original patent, and who was interested in the patent when Stock was making his application for it, testifies that, after Stock received the patent from the patent office, he "heard him make a great fuss about it; seemed to be disgusted. He said the patent didn't amount to anything. I think I heard him say it was not worth going to New York after, or words to that effect. He talked with Mr. Jack, Mr. Walker, and myself on two or three occasions. He made a good many com-

plaints about his patent. * * * Question. I understand, then, that what Mr. Stock thought he was achieving by his machine was to throw targets without tongues? Answer. I guess that is about it. Q. Did he have any other effects produced by his machine? A. Not that I know of. Q. Did you ever discuss with him the question in what respect, or in what particular, the original patent was defective? A. If I did, I don't remember what was said at the time."

Frank Jack, the secretary of the Peoria Target Company, stated that Stock returned from New York in July, 1883, and said he had a scheme to throw targets without a tongue; that he delayed until December because there was no tongueless target on the market; that he saw Stock after he received the patent; that he expressed himself forcibly, and somewhat profanely, about the way the claims read; said it was not what he wanted at all; that there were other ways of releasing the target, which others could use, and which Munn & Co. should have prevented.

Damm, witness for defendants, testified that he heard Stock make complaints about his patent after he returned home, and said that he ought to have a patent that would cover everything that would drop below its plane. He did not think the patent sufficiently broad to cover all manner of dropping devices.

West, the solicitor, in the employ of Munn & Co., who prepared Stock's original application, called for the defendant, testifies emphatically that the principal feature of the patent, as explained to him, was the dropping movement of the clip for discharging the target at the proper interval of time, and Stock did not disclose to him that the turning of the clip produced any rotary movement of the target itself; that Stock seemed well, and looked well; that he was clear in his mind, and described to him clearly his invention; that he saw Stock twice thereafter with reference to other patents.

West's credibility is attacked because he accepted $50 for services rendered by him in making searches of Munn & Co.'s record, and a report to defendant's counsel, with reference to facts important in connection with his own evidence. While it might have shown more delicacy on his part to have declined the employment, under the circumstances, we do not think it impeaches his credibility. The fact may make him a partisan witness, but nothing more.

In rebuttal, Kimball, the president of the Peoria Target Company, took the stand, and then, for the first time, testified that, when he heard Stock describe his invention to West, Stock explained the necessity for the target revolving in the air, in order to fly; that he distinctly remembers hearing him say that, unless the target spins fast enough, it will not go fast enough; and that he did not lay any great stress on the dropping motion of his trap.

It also appears from the record evidence of the patent office that in one of the patents, application for which was made by Brown on behalf of Stock, he claimed the advantage derivable from a pivotal carrier in adding axial rotation to the target. The application for this patent was made as late as October 13, 1884, and this application was made after Brown, as the patent solicitor for Stock, had seen and examined the specifications and patent

issued to Marqua in May, 1884, in which a pivoted carrier was shown, and the advantage of an additional axial rotation was dwelt upon in the specifications, and the pivoted feature was claimed in the patent claims, and allowed by the patent office. The claim made in Stock's application of October 13, 1884, was rejected by the patent office because it was anticipated by Marqua's patent, issued in July. This rejection was acquiesced in by Stock's administrator on the application of October 13, 1884, and a patent thereafter accepted, which did not include it. The petition for the reissue in the original patent 295,302 was not made until March 27, 1885, after it had become certain that Marqua's patent stood in the way of any patent for a pivoted carrier which should not antedate his.

Taylor E. Brown, one of the solicitors in the present case, testified that Stock called upon him, and consulted him about obtaining a reissue of the patent of March 18, 1884; that he said to him (Brown) that the letters patent did not express his invention, and thought he could have it corrected by simply returning it to the commissioner with a request to that effect; that, with some difficulty, it was explained to him that in order to correct his patent a reissue must be had, and to accomplish that a new application must be made out and filed. The next day Stock left for home, without deciding what he would do about a reissue, and said he would write about the matter. In the mean time, Brown examined the original letters patent, and came to the conclusion that he had sufficient ground for the application for a reissue. Brown recollects that he saw the Marqua patent of July 15, 1884, in the Official Gazette, about that time, and it seemed to him it would interfere with the Stock patent.

If it were true that Stock had intended to make the claims which were contained in the reissue, why did not Brown say so in his evidence? His silence upon that point is the strongest evidence to this court that it was not until after he himself had examined Stock's original patent, and had seen the patent issued to Marqua, that he discovered that in the original patent was a device upon which Stock might have made the claim which appears in the reissued patent; that is, that Stock might have made the claim, if, in fact, he intended to make the claim, and had realized the value of a pivotal carrier in its effect upon the axial rotation of the target. Brown says that he advised him (Stock) that he would have to make an application for a reissue in order to correct the patent and secure the claims, and yet Brown himself made an application for Stock on another patent, in which he set up this claim with reference to a pivoted carrier, in October, 1884, and thereafter, as solicitor for the administrator, acquiesced in its rejection. Learned counsel advance the theory that Brown made a mistake of law in this, but there is no evidence to support the theory. Brown does not say he made any such mistake. Brown's advice to Stock that his objections to the original patent could be cured by reissue, only, and his subsequent conduct in including the broad claim for a pivoted carrier in an application for another

patent, can only be reconciled on the hypothesis, which is sustained by everything else in the case, that Stock's objections to his original patent were based on some other ground than that it failed to claim, broadly, the pivoted carrier. Except an indefinite statement of Kimball, president of complainant, that Stock told West that it was important to have the target spin in the air, there is nothing in the case tending to show that Stock intended to claim a pivoted carrier, broadly, as in the reissue. Kimball's statement is weakened by the fact that though he made an affidavit for the reissue, and testified in chief, he said nothing of what Stock told West until rebuttal, and this, to meet West's evidence. On the other hand, everything in the case tends, convincingly, to establish the fact to be that the advantage of the pivotal connection of the carrier, in giving the target additional axial rotation, was an afterthought, not in Stock's mind at the time he made his original application, and acquired months after the patent was issued, after consulting with his solicitor, and after learning of Marqua's patent. We fully agree with the court below that the evidence shows that the reissue to Stock's administrator, with its new claims, plainly copied from Marqua's claims, was applied for and obtained for the purpose of "overreaching" Marqua's patent, and without any just ground therefor. ·

We are therefore of opinion that, as there was no evidence before the commissioner tending to show the inadvertence, mistake, or accident required by the statute, which would warrant the reissue in the form in which the commissioner issued it, and as the additional evidence adduced only confirms us in the opinion that no such inadvertence, accident, or mistake actually existed, the new and additional claims in the reissued patent are void.

Our conclusion upon the evidence makes it unnecessary for us to consider the objection made to the validity of the reissue, based on the ground that by the acquiescence of Stock's administrator in the rejection of the broad claim for a pivoted carrier, in the application for a patent filed October 13, 1884, he was estopped from subsequently making the same claim in an application for a reissue of the patent applied for December 23, 1883.

2. The second question is whether defendant's device is an infringement of the first claim of complainant's original and reissued patent. The first claim is:

"(1) The combination with the throwing arm of a target-throwing device of a clip for holding the target, arranged to automatically drop below the upper surface of the throwing arm for releasing the target, substantially as described."

The various devices shown in Fig. 2, Fig. 3, Fig. 4, Fig. 5, Fig. 6, and Fig. 7 of the original and reissued Stock patent leave no doubt that the one thing which was present in every one of the devices was the holding of the target by a piece rising above and at right angles to the plane of the throwing arm, in front of the outer edge or rim of the saucer-shaped target, thereby holding the target, and releasing it when it dropped automatically below the plane, and away from in front of the rim. In Fig. 2 the automatic

dropping of the piece is accomplished by the centrifugal force of the carrier or swinging arm in overcoming the resistance of a yielding spring. In Fig. 3 the target is held in a slightly different way, but the operation is much the same. The dropping of the plate that holds the target drops the button out of the way of the target at the end of the sweep of the swinging arm. Fig. 4 operates much in the same way. In each case the piece which holds the target drops below its shoulder by reason of the action of the centrifugal force on the yielding power of the spring. In Fig. 5 the button drops into a slot as it turns with the movement of the swinging arm. In Fig. 6 there is no spring, but the target is held to the throwing arm, A, by the block of rubber, B, held to the bent plate, O, and hinged to the plate, P, which is pivoted upon the upper side of the arm, A. To the under side of the arm, A, is secured the slotted plate, q, the slot of which concides with the slot, d, made in the arm, A. The edge of the plate, q, is rounded, and projects beyond the sides and end of the arm, A, as shown at q', and the under side of the plate, o, is formed or provided with the toe, o', which, as the throwing arm swings about, moves the plate, q, until it reaches the slot, when working upon the hinge, it falls into the slot carrying the bent plate, o, and the rubber, b, below the plane, and thus releases the target. Fig. 7 is substantially the same device.

In the Hebbard carrier, the target is held in the carrier by two fingers, one of which is pronged, and the other of which is kept pressed against the side of the target by the tension of a spring. The holding force of the spring-head finger is overcome by the centrifugal force generated by the swinging of the carrier and that of the throwing arm, and the target is released from between the fingers. Devices 1, 2, 3, and 4 of the Stock patent, and the defendant's device, do resemble each other in this, namely, that the centrifugal force overcomes the retaining force of a spring to release the target. But the claim in the Stock patent is limited to a device by which there shall be a positive release of the target, by a dropping away of the piece which holds it, and not by the gradual overcoming of a spring directly applied to the side of the target. In several of the devices, the dropping of the holding piece is secured without the aid of a spring. The one feature that is common to the Stock devices is the dropping of the piece out of the way of the target. The claim is for this, and not for the overcoming of a spring which holds the target by direct pressure. It is very doubtful whether a broad claim for the release of a target by the opposition of the centrifugal force to the retaining power of a spring was novel when Stock applied for his patent in December, 1883, because, under the much earlier Ligowsky patent, the target was held by a tongue inserted between two jaws held together by a spring, and was released by the centrifugal force overcoming the retaining power of the spring operating upon the jaws. Stock, in his original and in his reissued patent, adhered to the positive dropping out of the way of the target of the piece which held it in front of its outer rim. Now, it is true, if the target

were rested on its convex side, and a piece were inserted against the outer rim downwards, and there were an arrangement for the lifting of the piece by the use of a spring, with the result that there were an upward movement, instead of a downward one, out of the plane of the target, such a device would be the same device as the one described in Stock's patent; and the same might be true of a device for moving the obstacle away from in front of the target in a sideway direction. But the difficulty with the complainant's case is that the difference between Stock's releasing device and Hebbard's is not confined to the difference between a sideway and a dropping motion of a holding piece. The difference is between the sudden releasing of a target by the positive dropping of a piece from in front of it and the gradual release of a target by a gradual reduction of the friction or pressure force which holds it.

For that reason, we do not think that the first claim of the Stock patent was infringed. We are of opinion that the court below was right in dismissing the bill, and the decree of that court is affirmed.