CLEVELAND TARGET CO. v. EMPIRE TARGET CO. et al.

(Circuit Court, D. New Jersey. October 5, 1899.)

1. PATENTS—INFRINGEMENT—TARGET TRAPS.

Letters patent No. 301,908, dated July 15, 1884, issued to Philip Marqua, for improvements in sending-traps for flying targets, sustained, and held to have been infringed as to claims 2, 3 and 5 by the defendant.

**2. SAME—CONSTRUCTION OF CLAIM.**
In view of the prior state of the art and particularly of letters patent No. 322,714, issued to Albert H. Hebbard, and letters patent No. 330,704, issued to Fred Holz, if letters patent No. 371,839, dated October 18, 1887, issued to Charles C. Hebbard for improvements in target-traps can be sustained at all, claim 1 must receive a construction so strictly limiting and confining it to the specific device described in the specification and shown in the drawings as to avoid the charge of infringement.

This was a suit in equity by the Cleveland Target Company against the Empire Target Company, A. H. Hebbard, Charles C. Hebbard, and William H. Rankin for the infringement of certain patents relating to improvements in traps for sending flying targets.

E. A. Angell, for complainant.
H. C. Lord, for defendants.

BRADFORD, District Judge. The bill charges infringement of letters patent No. 301,908, dated July 15, 1884, issued to Philip Marqua, and No. 371,839, dated October 18, 1887, issued to Charles C. Hebbard, and contains the usual prayers. Both of these patents relate to improvements in traps or sending apparatus for flying targets and are held and owned by the complainant. The defences relied on as to both patents are lack of novelty and of invention and non-infringement, and, as to the Marqua patent only, also estoppel and failure to disclaim. The drawings of the Marqua patent are as follows:

Fig. 3

Fig. 4.

Marqua thus described the objects and operation of the mechanism set forth in his patent:

"My invention relates to 'traps' or sending apparatus used in projecting clay targets or 'pigeons' into the air for sporting purposes, its object being to render the same more efficient and produce a more perfect flight of the target, and also to adapt the same to a sending of a 'tongueless' target. Such traps, as at present used, employ a pivoted arm carrying the target usually secured thereto by a tongue, and by the partial rotation of the arm upon its pivot and the sudden arresting of its movement the target is projected into the air with an independent rotary motion. The flight thus imparted is not always uniform or satisfactory, but may be rendered so by imparting to the target a sudden impulse at the instant of projection independently of the carrying-arm. One of the objects of my invention is to produce a trap capable of imparting this sudden and independent impulse; and to this end it consists in mounting upon the main sending-arm an independent pivoted carrier, which, by the movement of the arm and at the instant of arrest, is swung around upon its pivot by its own centrifugal force, and suddenly thrown into line with the main arm as an extension thereof, releasing the target at the culmination of the instantaneous independent impulse which imparts additional force both in projection and rotation. This feature of my invention may be independently used with traps adapted to targets either with or without tongues. The remaining features of my invention relate more especially to the means for projecting a tongueless target, and consist in holding and releasing apparatus, as hereinafter more fully described. In the drawings accompanying and illustrating this specification, I have shown a form of apparatus in which all these features are embodied. Fig. 1 is a perspective view of the apparatus complete; Fig. 2, a vertical longitudinal section of the same; Figs. 3 and 4, similar perspective and sectional views of a modified construction. In the drawings, A designates the

ordinary sending-arm of a trap, the latter being of any approved construction, and requiring here no special illustration or description. To the outer end of the arm A, I attach a pivoted extension, B, which forms the carrier of the target C, a shallow cylindrical cup of fragile material, which in the present case, Fig. 2, is shown tongueless. The carrier is an approximately triangular or semicircular holder, preferably formed of sheet metal, having a turned-up edge at two or more points, as at L L, forming guide-stops for the target when placed in position upon the bottom of the holder B. In the present case I employ, also, a spring-catch in the form of a bell-crank lever pivoted upon the carrier, with one arm, c, bent forward as a trigger, resting upon the target and holding it by pressure downward upon the carrier, and the other arm, c', extending rearward beneath the main arm A, in such relation that in the independent pivotal movement of the carrier when the latter reaches its ultimate position, the arm c' is brought beneath the main arm A, and by a suitably-curved extremity, f, acting against the main arm as a cam, the trigger end c is forced upward against the force of a spring, S, and the target released. The construction of the parts in the present case is as follows: The outer end of the sending-arm A is formed into an enlarged cylindrical head, A', perforated vertically. A hollow stud, D, is fitted to this perforation, serving as a pivot and retaining-bolt for the plate or carrier B, which is similarly perforated. The pivot D passes through the head A', and is secured above by its enlargement, and below by a screw-nut, N, with an intervening spring-washer, w. The bell-crank trigger passes through the opening of the stud D, being pivoted above between two lugs, l l, rising from the upper end of the stud at the sides of the perforation. The pivot-pin p, passing through the lugs and trigger, is extended laterally and forms a holder for the spring S, which is bent horizontally around the lugs, and rises thence vertically behind and engages with a vertical extension, c², of the trigger-arm. The operation is as follows: The trap being set, the target is placed in position upon the holder and secured beneath a tooth, F, of the forward extension of the trigger-arm. The holder is then thrown back to an acute angle with the arm A upon the side from which the movement of the latter proceeds. By the swinging of the main arm the carrier is impelled by its own centrifugal force to rotate upon its pivot in the same general plane and direction, and at the moment of arrest of the main arm by its provided stop the carrier is suddenly swung outward to its extreme position, and by the action of the trigger mechanism the target is at the same instant released, the swing of the carrier and the centrifugal force of the target acting against the holding-flange or tongue L as an abutment, imparting to the target a rapid whirling motion, which, with the sudden access of projecting force at the moment of release, gives a perfect and absolutely controllable flight, regulated by the degree of impelling force. In the modified form of apparatus shown in Figs. 3 and 4, the carrier consists of two arms formed to clasp the target around its marginal wall, and to release it by spreading apart. The construction is as follows: The clasping-arms G G, formed to embrace and hold the target, as described, are secured at their rear ends to a stud or block, e, rising from a plate, B', pivoted to a stud or block, D', which in turn is pivoted upon the enlargement A' of the main arm A. The stud D' is somewhat elliptical in horizontal section, with its lower portion cylindrical, forming the pivot for the plate B',—an arrangement permitting the stud to be adjusted with its longer axis in any desired relation to the main arm A without interfering with its function as a pivot for the plate B'. The adjustment is effected and the stud secured to the enlargement A' by means of a thumb-screw, H, constituting also the pivot of the stud D', the object of the adjustment being to place the elongated stud D' in such relation to the axis of the main sending-arm that when the pivoted carrier (consisting in this case of the plate B' and the arms G secured thereto) is swung around by its centrifugal force the arms will be separated by impinging against the extremities of the stud E and release the target at the proper moment."

The claims of the Marqua patent in suit are as follows:

"1. In a trap or sending apparatus for flying targets, a sending-arm provided with a pivoted extension constituting the target-carrier, which, by the motion and arrest of the sending-arm, is independently rotated upon its pivot by centri-

fugal force into a position elongating the main arm, and projects the target by a sudden rotary impulse, substantially as set forth.

2. In a trap or sending apparatus for flying targets, a sending-arm provided with a pivoted extension carrying the target, and having an independent rotation by centrifugal force, in combination with target holding and releasing mechanism automatically actuated to release the target at the moment of extreme extension of the sending-arm, substantially as set forth.

3. In a sending apparatus for flying targets, in combination with a pivoted sending-arm having a pivoted target-carrying extension, a spring-catch adapted to hold the target and release the same automatically at the proper instant of time, as set forth.

4. In a target-sending apparatus, in combination with the main arm A and pivoted carrier B, the trigger c, provided with the releasing-arm c' f, and holding-spring S, substantially as and for the purpose set forth.

5. In a target-sending apparatus, the combination of the main arm A and pivoted extension B, provided with automatic holding and releasing devices, with the adjustable spring-washer w, for regulating the frictional resistance to centrifugal action of the carrier, substantially as set forth."

The charge of infringement as to these claims is confined to claims 2, 3 and 5. The device of the Empire Target Company, hereinafter called the defendant—for it is substantially the only defendant in the case,—which is alleged to infringe, is represented by the following drawing:

It consists of a target holder or carrier pivoted to the outer end of the throwing arm of a sending trap and provided with mechanism for the disengagement of a tongueless target at the instant of its flight from the trap. Its construction and operation are well described in a general manner by counsel for the defendant as follows:

"At the outer end of the sending-arm, there is pivoted what is termed the carrier, which is designed to hold the target and from which the target is thrown. * * * The carrier is formed of sheet metal, and is composed of two fingers, one pivoted on the other. A small spring is secured to said fingers, and draws them toward each other, and gives to them the grasp which holds the target. One end of the spring is secured to an eye-bolt on which is a thumb-nut. The tension of the spring and, hence, the grasp of the fingers is adjusted by the nut. One finger has on its outer end a rubber covered post. Oppositely placed on the other finger, is a metal post capped with a small metallic disk. Near the crotch is another rubber covered post, with a hook top. A target placed in the carrier, is engaged by the three posts. The trap is set by bringing the sending-arm around back of the catch. In modern practice the carrier is placed in line with the sending-arm. When the trap is sprung, the carrier at

the first impulse, by reason of its inertia, falls back of, or lags after, the sending-arm. This momentary backward movement of the carrier breaks the shock, incident to the starting of the arm. As soon as the carrier gets under motion the manifestation of inertia known as centrifugal force becomes active, and this swings the carrier outwardly on its pivot, to a position in line with the sending-arm. During this outward movement, which may be termed a catching-up movement, the carrier moves somewhat faster than the sending-arm. This initial lagging action of the carrier also reduces the radius of the arc, forming the path for the target, and thus, the momentary retarding of carrier reduces very materially the releasing or centrifugal force of the target. As the carrier swings out, the centrifugal force is suddenly increased by reason of the increased radius and the swing of the carrier on its pivot. The tension of the spring on the carrier is so regulated that the grasp on the target is not sufficient to withstand this sudden acquisition or jerk of centrifugal force, so that the target overcomes the grasp of the fingers approximately at the moment the carrier reaches the position in line with sending-arm, and thus releases itself."

It may here be added that the pivoted extension or carrier in swinging on its pivot moves in the same plane as the sending-arm or in a plane substantially parallel thereto, and that the holding mechanism of the carrier is such that the periphery of the target after the trap is sprung and until the target is disengaged from the trap moves in the same or substantially parallel plane.

The defendant contends that the claims of the Marqua patent cannot on a fair reading and particularly in view of the prior state of the art be so broadly construed as to bring the alleged infringing device within them. And, further, that such a construction would necessarily result in the nullification of the claims by reason of certain alleged anticipating patents and other anticipatory matter. What was the prior state of the art as disclosed in the record? The earliest date assigned for the Marqua invention is the early part of July, 1883. When inanimate targets began to supersede live pigeons in the sport of trap-shooting, glass balls sometimes filled with feathers were principally used. The glass ball thus employed was unsatisfactory. It could not well be thrown a sufficient distance. Its flight was too regular to resemble that of a live pigeon, and it was consequently too easily hit by the marksman. George Ligowsky received letters patent No. 231,919, dated September 7, 1880, for a concave or dish-shaped flying target. He described his invention in part as follows:

"My improvement consists in constructing flying targets in such a manner as to cause them to imitate more closely the flight of a bird as soon as the device is projected from a suitable trap or 'sender.' This result is accomplished by giving to such targets a concave or dished or saucer shape, whose rim is slotted to receive a tongue of thin sheet metal or other light material, which tongue is to be inserted between the jaws of any trap capable of projecting the target in the manner desired. The target, being thrown by a force thus applied near its periphery, has an axial rotation imparted to it that insures the utmost accuracy of flight, while the concavity of the device serves to partially imprison the air as soon as the momentum of the target is spent. Consequently the target descends gradually, and is not broken in case it falls on hard ground. * * * The arm or spring of the trap carrying the aforesaid clamp is then allowed to swing around very quickly in a horizontal or inclined plane and to be suddenly arrested, thereby releasing the target from the clamp. Evidently the target will now be projected into the air with a velocity proportioned to the strength of the actuating spring, and, being thrown by a force applied to its periphery, said target has imparted to it a very rapid axial rotation that in-

sures the utmost accuracy of flight. * * * The tongue E, instead of being applied to the target, may constitute part of the trap or sender, being in this case so arranged as to readily slip out of the slot D when said trap is sprung; or said tongue may be twisted so as to have somewhat of a spiral shape for the purpose of imparting a wabbling motion to the target."

Having invented such concave or dish-shaped flying target, Ligowsky afterwards received letters patent No. 252,230, dated January 10, 1882, for an improved target trap. In the description of this patent he says:

"The object of this invention is to furnish a trap especially adapted for throwing the peculiar form of flying targets seen in letters patent No. 231,919, granted to me September 7, 1880; and the trap consists essentially, of a spring-lever, target-clamp, trigger, adjustable standard, and devices for maintaining said standard at any desired inclination. * * * The trap is usually employed for imparting a horizontal flight to the target. * * * When this sweeping motion of the lever has attained its maximum velocity the tongue of the target is automatically disengaged from the clamp r' s', and said target skims off with a spinning action that closely imitates the flight of a quail; but the moment this maximum velocity has been reached the further sweep of the lever is gradually arrested on its own coil p, thereby preventing a violent jar or concussion, and thus obviating the breakage of the target, which latter, being composed of a fragile material, would be shattered to pieces in case the lever should be checked with a sudden stop, as is customary with those traps employed for throwing the ordinary balls."

Ligowsky's trap in connection with his improved target undoubtedly possessed great merit and met with much success and constituted a distinct and marked advance in the art of projecting flying targets. The target used in the trap had a tongue extending from its periphery consisting at first of a strip of pasteboard glued to the target and afterwards of an integral extension of the edge of the target. The tongue was inserted in a spring clamp at the outer end of the sending-arm, the initial position of the target being such that a straight line drawn through its center and tongue would be practically at right angles with the arm, and the tongue being held in the clamp with such pressure as to offer frictional resistance sufficient to prevent its escape before the arm attained its maximum velocity. Although Ligowsky's target patent contemplated a target with a twisted or spiral tongue to give a "wabbling motion to the target" as well as a target with a straight tongue, in practice the latter was used. When held in position, the concave side of the target was downward and its periphery was approximately in the plane in which the sending-arm moved. The trap being sprung, the sending-arm carried the target by its tongue, if operating normally, until an instant after the arm had attained its greatest speed, when by reason of the partial arrest of the arm through the resistance of its own spring coil, and the momentum of the target, the latter swung around and released its tongue from the spring clamp with a jerk or flip and entered upon its flight with considerable velocity and rotary motion. When the sending-arm was adjusted to move in a plane nearly parallel to that of the horizon a skimming movement was imparted to the target, said to resemble the flight of a bird. The meritorious features of the Ligowsky mechanism are obvious. His trap threw a saucer-shaped target which, unlike the glass ball, could be made to sail or skim through the air. It threw the target in such manner as to impart

to it through its sudden swing around its tongue, as held in the spring clamp a moment before its discharge, a rapidity of rotation much greater than it would have acquired from the motion of the sending-arm without such terminal swing.    It carried the periphery of the target and discharged it approximately in the plane in which the sending-arm moved.    The result was that the target attained a longer and in other respects more satisfactory flight than had theretofore been secured.    There were, however, in the Ligowsky device inherent limitations of usefulness for the purpose for which it was intended.    The insertion of the clay tongue of a target in the spring clamp was not calculated to insure a nice adjustment of the plane of the target's periphery in its relation to the plane of motion of the sending-arm, and the resistance of the air to the tongue of the target when rapidly spinning after its disengagement from the trap could not fail to disturb its plane of rotation, largely overcome its rotary motion and injuriously affect the evenness and length of its flight.    The presence of the tongue also prevented an even rotation of the target on its axis, which is considered indispensable to the most desirable flight.    The movement of the target through the air was too irregular and uncertain.    Indeed, it is doubtful whether Ligowsky fully appreciated the importance of securing an even rotation of the target in view of his suggestion of a device to give it a "wabbling motion."    In practice it often happened that pasteboard tongues became loose, clay tongues were not strong enough to resist the shock of the trap, and clay targets were too strong readily to be broken with shot.    Nicholas Fischer received letters patent No. 281,183, dated July 10, 1883, for a cylindrical cup-shaped flying target made of clay or similar material.    In the description of his device he says:

"My invention relates to flying targets, sometimes called 'clay pigeons,' designed to be projected into the air by suitably-constructed mechanism and used as a mark for shooting practice.  Such targets are made in shallow-dish form, of burned clay or other fragile material, and are thrown into the air in an approximately horizontal position, and a rapid axial rotation at the same time imparted to them by the sending-mechanism.  It will be obvious that it is desirable that such targets should be made of as light a weight as possible and free from any feature of construction offering an impediment to rotation while in the air.  As heretofore constructed, such targets have been of dish form, with a radial tang or projection, either formed as part of the target or of other material attached thereto, or with a slot or opening in the peripheral flange for engagement with the throwing-arm of the sending mechanism.  By the mechanism usually employed, the sending force was thus applied by such tang or slot to the peripheral flange in such manner as to require special strengthening of the flange, either by thickening or providing the same with a strengthening-fillet, or by other special devices, thereby adding unduly to the weight and creating impediments to the proper sending and rotation of the target, and impairing the freedom and proper movement while in its flying course in the air.  Moreover, these features of construction form a serious addition to the cost, which it is desirable to avoid in view of their necessary destruction in the using.  My invention obviates all these difficulties; and it consists in the construction of a target of plain, cylindrical, or dish form, without tang, slot, fillet or thickening of any part, and generally lighter in construction than those now in use, it being intended to throw this target by means of a swinging arm provided with a resisting-guideway, whereby the target is projected into the air by centrifugal force, and the rotation imparted to it by the resistance of the guideway acting centripetally upon the target from without,

the force being thus applied in a direction and in a manner enabling the thinnest and lightest shell target to be freely used, and thereby securing a perfect movement in the air when projected from the trap, and the minimum of cost in production. * * * By reason of the construction thus described, the target may be propelled much farther into the air, is enabled to maintain itself much longer in flight, and is not so subject to the action of gravity, but is more perfectly controlled by the gyratory forces, and is, indeed, in all respects essentially improved in cost, construction and efficiency in use."

While the Fischer patent covers a target and not a trap, the description and the accompanying drawings disclose trap mechanism which marks another material advance in the art of throwing targets. A device is shown for projecting a tongueless cup-shaped target with a cylindrical periphery capable of even rotation on its axis. The box or case containing the target is rigidly attached to and forms an extension of the sending-arm and is adapted to carry the target, during the swinging of the arm and until the flight begins, in such position that the plane of its periphery is coincident with the plane in which the arm moves or with a plane parallel thereto. The containing-box or case is square or rectangular and open at one side to permit the escape of the target and is so adjusted to the sending-arm that two of the closed sides are each at an angle of about 135° with the line of the arm, the other closed side being at an angle of about 45° with that line and inclining toward the direction in which the arm moves in swinging forward. The last mentioned side forms a guideway for the target. After the trap is sprung, centrifugal force acting upon the target through the swinging of the arm causes its periphery to press against and roll from its initial position along the guideway in escaping from the box, with the result that the target by the time of its disengagement acquires considerable rotary motion in the proper plane. The trap device thus disclosed clearly shows an improvement upon the Ligowsky trap in two important particulars. It threw a target which, being tongueless, could evenly rotate on its axis with comparatively little atmospheric resistance to its rotation; and it threw a target with axial rotation in the proper plane. It lacked, indeed, one feature of the Ligowsky trap, namely, the terminal swing of the target on its tongue in the spring clamp, which in the earlier device contributed so largely to the rapidity of the target's rotation. It is questionable, however, whether this omission was not fully, if not more than, supplied in the later device by the rolling of the target on the guideway in passing through and escaping from the containing-box or case. But both the Ligowsky and Fischer traps in construction and operation fall far short of the mechanism disclosed in the Marqua patent. The Marqua trap presents a combination of parts not diclosed either by Ligowsky or Fischer, co-operating in such manner as to produce a much more satisfactory flight of a target, namely, the combination of a sending-arm and a pivoted target carrier provided with mechanism for holding and releasing a tongueless saucer or cup shaped target, so constructed and adjusted as to throw the target more accurately in the desired direction, with increased axial rotation and projectile velocity and with its periphery in the proper plane. Neither the Ligowsky nor the Fischer trap disclosed the pivoted carrier, which

largely augments both the rapidity of rotation and the initial velocity of the target. Neither of them disclosed any mechanism by which the target could be accurately projected in any desired direction; the target escaping from the Ligowsky trap by wrenching its tongue out of the spring clamp, and from the Fischer trap by rolling out of the containing-case. Marqua's invention clearly was not anticipated by Ligowsky nor disclosed by Fischer; and I have not found anything in the prior state of the art, as shown by the record, to negative patentable novelty in it. That it possesses patentable utility there can be no doubt. The witness North, who has had large experience with trap mechanism, speaking generally of the pivoted carrier adapted to throw a tongueless target with its periphery in the plane of motion of the sending-arm, says:

"With the carrier pivoted to the arm of the trap, as is used in all successful target traps, a flight of sufficient distance anywhere from 40 to 100 yards can be obtained, the direction of the target in its flight can be guided and kept at any desired point, and the breakage and balks in the traps is so reduced to amount to but a very small percentage of the number of targets trapped. I have known instances of 1,000 or more targets being thrown with but one or two breaking in the trap, while with a carrier rigidly fastened to the arm a very unsatisfactory flight is obtained, the target having a wabbling motion and the flight rarely ever reaching over 30 to 35 yards, which is not up to the required distance as governed by the rules of target-shooting, and the direction of the flight varies very greatly, and in my experience was impossible to control, while the breakage in the trap was so great that it would be an impossibility to market a trap with a carrier of that description."

He further states that a pivoted carrier "by swinging on its pivot, cushions the force of the blow and does not break the target."

The defendant claims that the Marqua invention was anticipated by trap mechanism invented by Charles F. Stock, and patented in March, 1884. The complainant's contention in this connection is two-fold: first, that as between the Marqua and Stock devices priority of date of invention must be assigned to the former, and, secondly, that the Stock patent does not cover, or, indeed, disclose the Marqua invention. The latter of these positions will first be considered. Stock received letters patent No. 295,302, dated March 18, 1884, for an "improved device for throwing targets." In the description he says:

"This invention relates to that class of target-throwing devices known as 'clay-pigeon and ball traps,' wherein a throwing-arm swinging upon a center is employed; and the invention consists in the employment of a novel device at the outer end of the throwing-arm for holding the target, the same being adapted to retain the target during the swing of the arm and to release it at the proper time for causing it to be properly projected into the air."

The claims are as follows:

"1. The combination, with the throwing-arm of a target-throwing device, of a clip for holding the target, arranged to automatically drop below the upper surface of the throwing-arm for releasing the target, substantially as described.

2. The target-holding clip, consisting of the pivoted plate, p, having the plate o, provided with toe o', hinged to it, in combination with the slotted plate q, all adapted to be operated substantially as described."

Seven drawings accompany and are referred to in the specification, showing five forms of mechanism. Four of them are adapted to

throw tongueless cup-shaped targets with a cylindrical periphery, and the fifth, represented by Fig. 7, to throw "glass balls or other targets having small orifices." The drawings are as follows:

In the device shown in Figs. 1 and 2 there is a flat tongue c, beveled or brought to a point at its lower end, inserted in the slot d, of the sending-arm, and there hinged or pivoted to the arm on the pin e, the point of the tongue, before the disengagement of the target, resting against the bent end f' of a friction spring f, secured to the lower side of the arm. The upper end of the tongue can swing outwardly through the slot on its hinge-pin or pivot whenever the

pressure of its lower point overcomes the resistance of the bent end of the friction spring, by which the tongue is held in position at right angles with the upper side of the arm "with considerable force." The clip B is composed of the bent plate a, provided with the rubber block b and hinged or pivoted at a $^2$ to the upper end of the tongue in such manner as to swing laterally. When the trap is set the plate is at right angles with the arm and the rubber block parallel thereto, the block being within and against the periphery of the target on the side in the direction of the initial motion of the arm, and the opposite portion of the periphery resting on the stationary part A' of the trap, against the lip C'. After the trap is sprung and during the accelerated swing of the arm centrifugal force acting upon the target and plate causes the latter to swing forward on its pivot, with the target bearing against the block, practically in the plane of motion of the arm, until the direction of such force approximately comes into line with the slot containing the tongue, when the same force acting upon the target and clip, the center of gravity of the two conjointly being above the hinge-pin or pivot e, overcomes the resistance of the friction spring and causes the upper portion of the tongue carrying the plate to move outwardly and downwardly through the slot, thus deflecting the plate and block from and impelling them below the plane of motion of the arm and permitting the target to escape from the trap. In the device shown in Figs. 3 and 4, a plate, having the button h pivoted upon it, is rigidly attached to the tongue c, which rests against the bent end of a friction spring. The tongue is pivoted in a slot in the sending-arm as in Fig. 2. When the trap is set the target rests on the plate, the button being within and against the periphery of the target in the direction of the initial motion of the arm. After the trap is sprung centrifugal force acting upon the target causes it with its own swing to turn the button on its pivot until, with the sweep of the arm, the same force acting upon the plate, tongue and target, is supposed at the proper time to overcome the resistance of the friction spring and cause the upper portion of the tongue to move outwardly and downwardly through the slot thereby deflecting and removing the plate and button from the plane of motion of the arm and allowing the disengagement of the target. In the device shown in Fig. 5, a plate j, is attached to the upper end of the bolt k, which passes through the end of the sending-arm and has the coil spring l around it to act between the under side of the arm and the nut i. There is a transverse slot m in the arm adapted to receive the plate. The plate has arms of unequal length. When the trap is set the plate rests across the slot and on the upper side of the sending-arm and in line with it, the shorter arm of the plate being farther out on the sending-arm than the longer, and the plate being within and against the periphery of the target in the direction of the initial motion of the arm. After the trap is sprung centrifugal force acting upon the target is supposed to cause it to turn the plate until the latter reaches such position that the coiled spring will draw it quickly into the slot and thereby release the target. The device shown in Fig. 6 is so similar to that disclosed by Figs. 1 and 2 as to require no explanation here. Fig. 7 shows a device operating on the same

principle as that in Fig. 6, and varies from it only so far as to be adapted to throw "glass balls or other targets having small orifices." While these several devices, except the last, show a pivot or bolt on or about which the block, button or plate in contact with the periphery of the target swings or rotates through the action of centrifugal force, whereby during the sweep of the sending-arm the target acquires or has imparted to it additional rotary motion, they are essentially different from the Marqua mechanism, not only in their principle of construction, but in their mode of operation and in their efficiency. They do not present the same combination of parts or equivalent parts co-operating in substantially the same manner to perform the same function. Whether they can or cannot properly be said to disclose a pivoted carrier is not necessarily a controlling question in the case. It may involve merely a dispute about terms. Marqua's device was of a very meritorious character and his patent should be "construed in a liberal spirit to sustain the just claims of the inventor." Such liberality can within proper limits be displayed as well by resorting to a narrow construction to avoid anticipation, as to a broad one fully to secure to an inventor the fruits of his invention. It is true that it is not expressly stated in any of the claims of the Marqua patent that the target carrier or the target is to rotate in any given plane. But the claims must be read in the light of the description and drawings, and so read they cover mechanism adapted to impart to the target rapid axial rotation in the plane or substantially in the plane of motion of the sending-arm and to project the target from the trap without changing the plane of its rotation. Such rotation without change of plane is absolutely indispensable to a satisfactory flight. Figs. 1 and 2 in the Marqua patent disclose a pivoted carrier B, on which a target rests with its rim in a plane parallel to that of the motion of the sending-arm and so near it as to be practically in the latter plane. The periphery of the target is in contact with the guide-stops L L, and the spring S causes the tooth F to press on the upper side of the target. The target is thus securely held during the swinging of the sending-arm and until the moment of its disengagement in the proper plane. When the tooth F rises the target escapes without any disturbance of the plane of its rotation. So in Figs. 3 and 4 of the same patent the target is securely held in the proper plane between the resilient clasping-arms G G until the moment of its disengagement and when these arms open the target is discharged without any such disturbance. It is obvious that such result cannot be accomplished by the device shown in Figs. 1 and 2 of the Stock patent. After the trap is sprung and until the disengagement of the target, while its periphery on one side is in contact with the rubber block b, there is no mechanism to hold the rim of the target in the proper plane. Gravity tends to cause the unsupported portion of the target to fall and the resistance of the air to its upper side by reason of its form probably has, within certain limits, the same tendency, when the sending-arm moves at only a slight angle to the plane of the horizon, and in so far as the rim of the target may approximate to the proper plane, the result is due to the overcoming to a greater or less extent of these tendencies.

by centrifugal force. On the other hand, when the sending-arm moves at a considerable angle to the plane of the horizon, atmospheric resistance to the under side of the target has a tendency to raise the unsupported side of the target above the plane of motion of the arm and cause the target prematurely to escape from the trap. When the sending-arm in its sweep has reached that point where through centrifugal force the pivoted tongue c is about to overcome the resistance of the bent end of the friction spring f and fall forward and downward through the slot, the side of the rubber block b in contact with the periphery of the target is at a right angle to the plane of motion of the sending-arm, the periphery of the target, if it has not previously escaped, pressing against it through the action of centrifugal force upon the target. When the resistance of the friction spring is overcome the block moves downward with increasing rapidity, changing the angle of its side in contact with the target until from a right angle it becomes nearly parallel to the plane of motion of the sending-arm. During the forward and downward swing of the block, if the rim of the target be not broken, one or probably two things will occur further to disturb the plane of rotation of the target. Until the side of the block in contact with the target has so far approached parallelism with the plane of motion of the sending-arm as to permit the rim of the target to drag over that side, the downward motion of the block will through its frictional contact with the rim of the target carry the side of the rim with which it is in contact downward, substantially changing and further disturbing the plane of motion. As soon as the contactual side of the block reaches such a point in its descent as to permit the rim of the target to drag over and away from it without being broken, the rim, if the target be moving with sufficient velocity, will pass up at least a portion of the inclined plane of that side of the block, whereby the opposite side of the rim will be impelled downward, thus causing still another change in the plane of the target's rotation. Substantially the same faults are inherent in the device shown in Fig. 6 of the Stock patent; and such of these faults as arise from the escape of the rim of the target from a descending block inhere in the device shown in Figs. 3 and 4. It is unnecessary to discuss the device shown in Fig. 7 for reasons already expressed. Fig. 5 presents a device materially different in its construction and intended operation. It is not stated in the specification that the plate j is rigidly attached to the bolt k nor that while the sending-arm is swinging and before it reaches the point where the target should be disengaged a comparatively large proportion of its rim is not in contact with the upper surface of the arm. But that these are facts is plainly to be inferred from the drawing. The resistance of the air to the exposed portion of the under side of the target when the sending-arm moves at a considerable angle to the plane of the horizon has the tendency to force the target upward and cause its premature escape, although possibly in less degree than in the device shown in Figs. 1, 2 and 6. But, aside from this fault, the mechanism on its face as well as on the other evidence in the case must be held to be inoperative. The target is intended to be released by the dropping

of the plate j into the transverse slot through the action of the coiled spring l between the nut i and the under side of the sending-arm. If the pressure of the spring is sufficient to cause the plate to drop "quickly into the slot," as contemplated by Stock, it is difficult to conceive that the same pressure would not cause such frictional contact between the upper surface of the sending-arm and the under surface of the plate, and also between either the upper end of the spring and the under side of the arm or the lower end of the spring and the upper side of the nut, as effectually to resist the tendency of the plate to turn, as intended, through the action of centrifugal force upon it and the target in contact with it. On the other hand, if the pressure of the spring is not sufficient to cause the plate to drop quickly into the slot, but is slight enough to allow it to turn under the action of centrifugal force to the position where it was contemplated that it should drop therein, one or more of several things can hardly fail to happen. The plate may, if turning with sufficient rapidity relatively to the line of the sending-arm, jump the slot, and, unless the target has prematurely escaped, prevent its release or break its rim, or possibly through a disturbance of the plane of motion of the target by atmospheric resistance, as above mentioned, the rim of the target may drag over the ends of the plate, further disturbing its plane. So, in the device shown in Fig. 6 the toe o' may jump the slot d with similar results. If the plate drops into the slot comparatively slowly, the rim of the target will either be broken against the plate through the sudden arrest of the lateral motion of the latter relatively to the sending-arm, or will drag over its ends, losing the proper plane of rotation. The evidence fully supports these conclusions. The fault of the mechanism consists, not in defective workmanship, but in the principle of its construction. Mechanism having such vital defects cannot in any legitimate sense be called operative. Careful examination of the several devices shown in the Stock patent has satisfied me that by reason of the manner in which the target is released from a descending block or plate with which its periphery has been in contact through the action of centrifugal force, not only is the target, if disengaged unbroken, caused when entering upon its flight to rotate in a wrong plane, but its axial rotation is so slow and its projectile velocity so small and the direction of the flight so uncertain as to render these devices valueless. That no one of them possesses the same combination of parts as that disclosed in the Marqua patent and covered by claims 2, 3 and 5, or, indeed, by any of the claims, or of equivalent parts co-operating in substantially the same manner to perform the same function as the Marqua mechanism, namely, the projection of a target from a trap with axial rotation in the plane of motion of the sending-arm or in a plane parallel thereto, is clear from the drawings and description. The doctrine of equivalents certainly should not be strained in favor of the Stock mechanism. In view of the substantial difference in function between the two inventions, it is unnecessary to enter into a minute comparison of the several parts forming the combination in the one with those forming the combination in the other. The Stock claims are limited to mechanism by which the target is intend-

ed to be released by the dropping of the part with which, through the action of centrifugal force, it is in contact, toward or below the plane of the upper surface of the sending-arm. No such feature is shown in or covered by the Marqua patent. The Stock mechanism itself discloses an invention different from that of Marqua. Neither the Stock patent nor his invention was an anticipation of the Marqua trap. It is proper to add that the patent was only a paper one. No traps were manufactured and sold under it. The invention was worthless. It was practically an unsuccessful and abandoned experiment. The conclusion reached on this branch of the case renders it unnecessary to consider the question of priority of invention as between Stock and Marqua.

The defendant claims that the Marqua invention was anticipated by certain mechanism invented by A. H. Hebbard and alleged to have been used at Knoxville, Tennessee, in the latter part of 1882. It is also contended that this mechanism included the pivoted carrier feature and was of such a character, even if not anticipating the Marqua patent, as to require the Marqua claims to be so narrowly and strictly construed as to negative infringement. Much evidence on this subject has been adduced on each side. It presents probably the most serious question in the case. It satisfactorily appears that Marqua conceived the idea of a carrier for a tongueless cup-shaped target pivoted to the outer end of the sending-arm and revolving on that pivot during the sweep of the arm, July 4, 1883; that thereafter during the same month he reduced his conception to a drawing plainly disclosing the parts and principle of the mechanism; that the mechanism so disclosed contained all the essential features of his invention as patented; that during or about October, 1883, he furnished a sufficient drawing of such mechanism to the witness Cook, who was a skilled blacksmith for the Marqua Manufacturing Company; that Cook commenced the construction of the mechanism during or about November, 1883; and that it was completed and successfully used in public in March, 1884. Marqua applied for his patent April 11, 1884. The intervals which elapsed between the completion of the first drawing made by Marqua and the delivery of the drawing to Cook, and between the time of such delivery and the commencement of the work of construction by him, and between the time of such commencement and the completion of the mechanism, are also satisfactorily explained. The evidence shows that there was no abandonment or laches on the part of Marqua. The date of his invention, therefore, may be carried back to the end of July, 1883, if not earlier in that month. Did Hebbard before the end of July, 1883, form a complete conception of a pivoted target carrier and fully embody that conception in a drawing, model or otherwise? If he did, a further question will have to be considered on this branch of the case. If he did not, no invention he subsequently may have made could anticipate or otherwise affect the Marqua claims. In a suit brought in 1888, in the circuit court for the Northern district of Ohio, by the Peoria Target Company against the complainant herein, hereinafter referred to as the Peoria-Cleveland case, on the Stock reissue patent, No. 10,867, dated September 13, 1887, among

the defences set up were non-infringement, the absence of inad-vertence, accident or mistake on Stock's part with respect to the original Stock patent already discussed, and the alleged Hebbard prior invention and use. The court held, among other things, that there was "no error in the application, specification, and claims of the original Stock patent through accident, inadvertence or mistake such as would entitle the patentee to a reissue thereof with new and broader claims," and therefore that claims 3 and 4 of the reissue patent were void; that claim 1 of that patent had not been infringed; and further, on a state of proofs somewhat different from that here disclosed, that Hebbard conceived and reduced to successful prac-tice in public a pivoted target carrier prior to December 8, 1882. 47 Fed. 728. The circuit court of appeals affirmed the decree on the first two grounds of defence above mentioned, but made no allusion to the alleged prior invention and use by Hebbard. 7 C. C. A. 197, 58 Fed. 227. Under these circumstances the question of priority may properly be considered an open one. A. H. Hebbard testifies to the effect that in the summer of 1882 he devised and constructed a tar-get carrier for what was known as the "Saturn target," having brass prongs within which the target was held; that the carrier was at-tached to the end of the sending-arm of a Ligowsky trap by a bolt or pin passing through the clamp and end of the arm in such manner as to allow the carrier, subject to the regulating resistance of a tension-spring, to swing on the bolt or pin; that when the trap was sprung the carrier moved out in a line with the sending arm, and centrifugal force caused the target to release itself from the prongs of the car-rier; that the inner face of the prongs on one side of the target was roughened, the prongs on the other side of the target being smooth, causing the target in escaping to acquire axial rotation; that exhib-its "Hebbard's First Throwing Device" and "Ligowsky Trap Arm" represent with substantial correctness his first carrier and its mode of attachment to the sending-arm; that he threw targets from this carrier in the presence of a number of persons in Knoxville, in 1882, and the device "worked fairly well"; that subsequently in 1882 he made another pivoted carrier device composed of wire and consisting of "two prongs with a parallel wire directly over it," for a tongue-less clay target; that the second carrier was pivoted in like manner as the first, the wire on one side of the target being covered with leather to impart through frictional resistance axial rotation; that exhibit "Hebbard's Second Target Throwing Device" correctly rep-resents the second carrier, with the exception of the leather wrap-ping; that he threw clay targets with this device in the presence of several persons; that shortly after making his second carrier he conceived the idea of a target "provided with a central hub in the center of a concave disk, the hubs extending slightly above and below the bottom of the device"; that he constructed a brass model to throw the target and made the target out of a tin box cover, inserting a wire through its center to represent its hubs; that exhibit "Heb-bard's Third Target Throwing Device" is the same model which he made; that he tested this device on the arm of a Ligowsky trap and found that it worked satisfactorily; that it was made and finished

within three or four weeks after October 8, 1882; that he showed it to his father, who according to the evidence died December 8, 1882, and also to others at the same time; that the only change he notices in the model is the absence of the leather which originally was "on the curved finger that bears on the outer ring of the target"; that soon after making the model and before the death of his father, he constructed or caused to be constructed a full sized carrier, which was attached in the same manner as the others to the arm of a Ligowsky trap, and threw from it in the presence of a number of persons tongueless clay targets having a "hub or axle in the center"; and that he was so satisfied with the result that he turned his attention to "suitable compositions other than clay from which to construct targets." The testimony of Charles C. Hebbard in this connection is substantially to the same effect as that of his brother with some minor variations, principally as to dates. He states positively that prior to the death of his father the pivoted target carrier was devised and used in public by his brother. The witness Powell testifies to the effect that in 1882 he worked as blacksmith for the Knoxville Iron Company and knew the Hebbard brothers and their father; that during the lifetime of the father he forged for A. H. Hebbard a device for holding a saucer-shaped target having a hub, consisting of "one piece forked and one crooked arm concaved at one end," and represented by exhibit "Powell sketch," which he more particularly describes; that he made the sketch the day before testifying; that he knows how the parts of the carrier were put together; that he cannot state positively how the device was to be used—"it was fastened to the trap"; that the prongs held the target; and that he has seen the device used at a distance but does not remember when. He does not state how the carrier was attached to the sending-arm,—whether pivotally or rigidly. The witness Lyle testifies to the effect that he was formerly a target maker and first became familiar with targets and target traps in 1882 in Knoxville; that in July of that year he saw a carrier in the possession of one of the Hebbards which, when the trap was set, was placed at an angle to the sending-arm, and, when the trap was sprung, "would come around straight and deliver the target with a spinning motion in the air;" that the Hebbards made a great many other carriers; that one of them was called by A. H. Hebbard a "pie-fork" and was "made out of steel wire and had two prongs, and each prong had a bar bent back on it to hold the target in place"; that it was "pivoted on to an arm and used in about the same way" as the first mentioned carrier; that it threw a clay target and closely resembled exhibit "Hebbard's Second Target Throwing Device"; that exhibit "Hebbard's Third Target Throwing Device" was the next carrier he saw in the possession of the Hebbards; that it was pivoted to the arm; that he saw it before the father of the Hebbard brothers died; that he saw a full-sized trap with a target carrier that was pivoted to the sending-arm, and he thinks this was in the latter part of 1882; that he saw the several carriers in use, although he does not specifically state when; and that he last saw the brass model about 1892. The witness Dow testifies to the effect that the first target carrier made by A. H. Hebbard

that he saw was the one called the "pie-fork," and was "made of two parallel strips of steel the right width to admit of a target"; that it was attached to the arm of a Ligowsky trap; that his impression is that it was "riveted in some way" to the arm; that in the first experiments it was tied to the arm and "when the arm was released it flew out"; that he saw clay targets thrown with this device; that afterwards the carrier "did not have that wrist motion, rigid, I expect"; that the next carrier he saw had the wrist motion and was "a device that would imitate, as near as possible, the action of the wrist on the human arm"; that it was a little brass model and is the exhibit "Hebbard's Third Target Throwing Device"; that it was made in the summer or early in the fall of 1882 and was used to throw little tin targets; and that afterwards an enlarged device, similar in construction and action to the model, was made and used before the death of the Hebbard father. In 1890 the Peoria Target Company brought suit in the circuit court for the Northern district of Ohio against the Standard Target Company and the Hebbard brothers on the Stock reissue patent above mentioned. The alleged Hebbard use was set up by way of defence, and the Hebbard brothers, S. A. Hebbard, their mother, Mary A. Hebbard, wife of Charles C. Hebbard, Dow, Lyle, Powell, S. Van Gilder and R. Van Gilder, among others, testified in support of such alleged use. The controversy was adjusted between the parties without reaching a decree. By stipulation of counsel the testimony of the above witnesses in that case, as well as certain affidavits therein used in opposition to a motion for a preliminary injunction, have been made part of the evidence in this case. By like stipulation certain testimony and affidavits hereinafter referred to, produced in the Peoria-Cleveland case, have also been made part of the evidence herein. In the Peoria-Standard case S. Van Gilder testified to the effect that in the spring of 1883 he met A. H. Hebbard in Knoxville and told him that he, Van Gilder, was at work on a trap and target, and that the trouble he found "was to get a device to throw targets without breaking," and that he "had been experimenting with a flexible steel spring, describing the same to Mr. Hebbard as being on the principle of a limber switch with a mud ball on the end of it, but the device would not work satisfactorily at all times"; that Hebbard said he "was working on a target, and his idea was that it should be thrown something after the manner of throwing a rock with a man's fingers, and that he was experimenting with his ideas trying to get up something that would beat the old Ligowsky clay bird"; and that Hebbard did not show him any target trap or device for throwing targets. R. Van Gilder testified in the same case to the effect that he was one of the witnesses whose names appear on letters patent No. 299,783, dated June 3, 1884, issued to A. H. Hebbard for an improved flying target, the application for which was filed November 23, 1883; that before he signed the application he had some conversation with Hebbard "about some device or invention for throwing a target, taking as a model the arm from the elbow down, using the thumb and first two fingers for holding the target, with wrist motion to throw it"; and that he had no idea how long before Hebbard made his applica-

tion for a patent this conversation occurred, "but it was before this application. It is my impression that it was some time before." In the same case Mary E. Hebbard testified to the effect that A. H. Hebbard was living with her family in Knoxville in 1882; that in that year he "was engaged in inventing a target trap"; that she recollected seeing "different models that he had and I recollect that he had such models before his father died"; that he threw targets in the yard with his "improved trap" and tried "to interest his father in his invention"; that she remembered seeing exhibits "Hebbard's First Target Throwing Device," "Hebbard's Second Target Throwing Device" and "Hebbard's Third Target Throwing Device," or devices resembling them, before the death of old Mr. Hebbard; that the Hebbard brothers made "drawings, or lead pencil sketches" of the invention A. H. Hebbard was making "on the side of the house where the porch was" and stood "in the walk illustrating with their arm and hand how they intended to have it work. In doing so they would bend their arm at the wrist inwardly and then as they threw their arm out they would throw their wrist out, moving the wrist joint. And I remember that they had pieces of cardboard which they would throw and make spin through the air"; and that she thought "Hebbard's Third Target Throwing Device" was the original which she saw in the fall of 1882. S. A. Hebbard testified in that case to the effect that Albert Hebbard, her husband, died December 9, 1882; that while she lived in Knoxville A. H. Hebbard was engaged in improving flying targets and target traps; that her two sons "and some of their friends often experimented with Albert's invention out in the yard, and I remember of my husband and myself often sitting on the porch watching them"; that during the summer of 1882 she saw appliances like the three target throwing device exhibits above mentioned in the possession of A. H. Hebbard; that she particularly recollected "Hebbard's Third Target Throwing Device"; that her sons spoke of "their father's mind failing, as they noticed that he did not take as much interest as he used to in things that they were inventing, and they seemed disappointed about it"; and that the last named device was packed among her sons' guns and other things when they moved from Knoxville to Cleveland. Charles C. Hebbard wrote to John P. Onderdonk, October 8, 1882, as follows:

"October 8th, 1882.

Friend J. P. O.—

Yours at hand. Father is about the same, altho' I think he is gradually growing weaker and he seems to be losing interest in everything, seldom going down to the shop now. If anything happens will let you know. You are pretty well up on patents, and infringements, etc., and I have a point I wish you would give us your opinion on. You know what the clay pigeon is with its pasteboard tongue or handle on the side for throwing it, well, sometimes these pigeons get wet and the tongues come off as they are glued on and Al. has got a device for throwing these, which grasps around the target and is pinned into the end of arm of trap where the tongue goes, it is smooth on one side and covered with leather on the other, so that it will spin as it comes out. Now what we want to know is would this clamp be considered the same as the tongue on the clay pigeons, it answers the same purpose, but does not go off with the target, but stays, of course, in the trap. Will enclose a sketch showing how the thing works. Kind regards to George and Dora.

"Yours as ever, Chas."

Certain photographs taken in 1884 and 1885 are in evidence as exhibits showing target traps with carriers made by the National Target Company with which the Hebbard brothers were connected; but these traps, with one exception, so photographed, are not claimed by the defendant to have been constructed prior to the summer or fall of 1884. The exception is the trap mechanism shown in exhibit "Hebbard Lockport Photograph." This photograph was taken not earlier than February, 1884. The evidence does not disclose when the particular mechanism appearing in it was constructed. Much expert testimony has been adduced on each side with respect to this photograph, the defendant contending that it clearly shows a pivoted carrier and the complainant claiming to the contrary.

The foregoing statement fully and fairly presents in effect all evidence in this case legitimately tending directly or indirectly to prove that A. H. Hebbard prior to the end of July, 1883, conceived and invented a pivoted target carrier adapted to swing on the end of the sending-arm of a trap. The evidence as so presented undoubtedly is strong. It is necessary, however, in order to determine its just weight, not only carefully to scrutinize it, but also to consider certain facts disclosed in the case which strongly tend to show that Hebbard did not invent or form the conception of a pivoted carrier in 1882, nor until after July, 1883. To establish the alleged Hebbard defence, the evidence taken as a whole must be full, clear and satisfactory, leaving no substantial doubt as to priority of invention by him. Has this requirement been met? The vital question is not whether Hebbard invented a target carrier in 1882 or in 1883 prior to the end of July. That he constructed and experimented with target carriers in 1882 there can be little or no doubt; nor that he made target holding devices for Saturn targets, tongueless Ligowsky clay targets and targets having hubs, in the order named. It is whether prior to the later date he invented a pivoted target carrier. With the exception of the brass model "Hebbard's Third Target Throwing Device," no target carrier claimed to have been constructed by him before the date of Marqua's invention has been produced as an exhibit. No drawing, photograph or other representation produced in evidence is claimed to have been made prior to that date. Nor is it claimed that, when any drawing, photograph or other representation in evidence exhibiting a target carrier was made, any target carrier alleged to have been constructed prior to the date named was present. With the exception of the Onderdonk letter above quoted, there is no correspondence or other writing in evidence describing or referring to any target carrier alleged to have been constructed before that date. It is clearly shown, and it is not disputed, that the brass model was not made or devised until after the Onderdonk letter was written. The evidence as to the time of its construction and that it is now in the same condition as when constructed is wholly oral. So, aside from that letter, the contention that Hebbard invented a pivoted target carrier before the date of Marqua's invention ultimately rests upon oral testimony, and from it is derived whatever probative force the various exhibits may possess. But little importance is to be attached to the Lock-

port photograph and the theories of the experts concerning it. It may or may not disclose a pivoted carrier. Apparently it does. If in January or February, 1884, the Hebbards were in possession of a pivoted carrier it would by no means follow that such carrier had been invented before the end of July, 1883. The Onderdonk letter is indefinite and inconclusive. According to the defendant's theory it was written by one who was familiar with a pivoted target carrier to another who personally had no knowledge of such a carrier, in order to ascertain the opinion of the latter whether the device therein referred to would infringe. The sketch mentioned in the letter is not in evidence. It is somewhat improbable, to say the least, that if the device embodied the pivoted feature so intelligent a man as his testimony shows the writer to be should not, in view of the purpose for which the letter was written, have plainly stated such feature. What the sketch may have disclosed or whether it contained such a statement is purely conjectural. The letter on its face is just as applicable to a carrier rigidly attached to the sending-arm as to a pivoted carrier. It evidently referred to the second carrier made by Hebbard called the "pie-fork" and used to throw tongueless Ligowsky clay targets; as it does not mention any device for Saturn targets, and the carrier for targets having hubs had not then been constructed. According to the testimony one side of the "pie-fork" was covered with leather and the other was smooth, so that the target in escaping from it acquired a rotary or spinning motion. Ligowsky received his target patent in September, 1880, and his trap patent in January, 1882. In the former patent it is stated that "the target, being thrown by a force thus applied near its periphery, has an axial rotation imparted to it," and in the latter, that "when this sweeping motion of the lever has attained its maximum velocity the tongue of the target is automatically disengaged from the clamp $r'$ $s'$, and said target skims off with a spinning action." The Ligowsky target acquired rotary motion from the turning of the tongue in the clamp. The tongueless target used by Hebbard acquired rotary motion through its escape from between the jaws or sides of a carrier offering unequal frictional resistance. So far as the spinning of the target was concerned the same purpose which was answered by the tongue and clamp in Ligowsky's trap was effected in the "pie-fork" mechanism by the sides or jaws of the carrier. The word "spin" as used in the letter clearly is referable to the target and not to the carrier. and the word "clamp" to the carrier. There is nothing in the letter to indicate that it had reference to a pivoted carrier, and it is very unlikely that such a carrier was in the mind of the writer, as he did not mention it. Much of the oral evidence adduced in support of the alleged Hebbard use is loose and unsatisfactory. Powell does not state how the carrier he forged was attached to the sending arm. R. Van Gilder's testimony is not in the least inconsistent with the priority of Marqua's invention. He states that he has no idea how long before he signed Hebbard's application for his target patent he had the conversation with him testified to, but says that it is his "impression that it was some time before." The application was not filed until about four months—possibly a little less, probably

a little more—after the date of Marqua's invention. S. Van Gilder names the spring of 1883 as the time of his conversation with A. H. Hebbard. His testimony was given in November, 1890. It is true he fixes the date with reference to the target-shooting tournament in 1883. But there was a similar tournament in Knoxville in the spring of 1884 and the witness was living there at the time. It appears from the evidence that Hebbard or the National Target Company with which he was identified, used a target trap containing a' pivoted carrier in Knoxville in the spring of 1884. The witness does not state that he had no conversation with Hebbard subsequently to the one testified to on the subject of traps and targets. It may well be that he was mistaken as to the year when it occurred. Furthermore, the statement attributed to Hebbard is indefinite and inconclusive. The testimony of S. A. Hebbard and Mary A. Hebbard is not entitled to much weight on the question when the pivotal feature of the carrier was first conceived and used. They, like the Van Gilders, testified in 1890. They may be right as to the general appearance of the several carriers made in 1882, and wrong as to their alleged pivotal attachment in that year. Their statements as to the brass model and the resemblance of certain exhibits to mechanism constructed in 1882 may reasonably be taken with some grains of allowance. Lyle worked for the Hebbard brothers or for companies with which they were connected from early in October, 1882, until sometime in 1892. He testified in the Peoria-Standard case as well as in this suit. His evidence here presents greater particularity of detail than his evidence in the former case. This circumstance does not add weight to his testimony. He undoubtedly remembers the fact that Hebbard or the National Target Company constructed a pivoted carrier, but he may have misstated the time when he first saw such a carrier. If priority of invention by Hebbard can be established it must rest upon the statements of the Hebbard brothers and Dow. The affidavits and testimony of these three witnesses disclose such inconsistencies, community of error and self-contradictions with respect to important points as seriously to challenge their evidence as to the date of invention of the pivotal feature of the carrier. A. H. Hebbard in his affidavit in the Peoria-Standard case states positively that he conceived his invention in the latter part of 1881, and Charles O. Hebbard, in his affidavit in the same case, states with equal positiveness that his brother in the latter part of 1881 communicated to him his conception of his invention. In this case they testified that the conception was first formed and communicated in the summer of 1882. Dow and the two Hebbards, in their affidavits in that case, state positively that the brass model was in existence in July or August, 1882. Referring to this model A. H. Hebbard says: "In the summer, July or August, 1882, I made a model of my conception, which model accompanies this affidavit;" Charles C. Hebbard says: "The next summer, in July or August, he made the model referred to in his affidavit, * * * and showed it to me and my father. * * * My father died in December, 1882, and from this fact I am positive as to its having been in the summer of 1882 that the model was made." Dow says: "I recollect distinctly of having seen

this model in July or August of 1882." These statements are irreconcilable with the Onderdonk letter of October 8, 1882, which refers to a holding device for a tongueless Ligowsky clay target, and not for a target with hubs. In the present case A. H. Hebbard states in his direct examination that the brass model, as nearly as he can remember, was made "directly after my other experiments in the summer of 1882," and, on cross examination, that "I should say it was made some time after the Onderdonk letter, possibly three or four weeks." Charles C. Hebbard states, on his direct examination, that the model was made "some time between June and September, I think; but I cannot state positively the exact day or month when it was made, but I know it was made some three months, or it might have been only two, before my father died;" and, on cross examination, that it was made "some time between September and December of 1882, to the best of my recollection;" but probably after the Onderdonk letter was written. Dow states, on his direct examination, that the brass model was made in the "latter part of the summer or early part of the fall of 1882; I could not say within a month or two months, but it was somewhere between those seasons;" and, on cross-examination, that it was made "some time in the fall of 1882; he made that before the old man died. * * * It was before bad weather, it was before cold weather set in." Attention is drawn to this testimony, not so much on account of discrepancies between statements in direct and those on cross examination, as by reason of the marked contrast its general uncertainty presents to the unqualified assertion in the affidavits of those witnesses that the brass model was in existence in July or August, 1882. It is extremely improbable that these witnesses, when making affidavit, severally and independently of each other fixed July or August as the date of the model, and, if they communicated with each other as to the date to be named, it is remarkable, in view of the showing of facts made in their testimony, that they should all have been so positive in their misstatement. There is another misstatement of date by them of a graver character. In their affidavits the Hebbard brothers state positively that exhibit "Hebbard Photograph A," disclosing a trap with a pivoted carrier, was taken in the spring of 1883. Dow in his affidavit says: "I recognize this photograph as one taken by the Hebbard boys of a Ligowsky trap with one of Albert's target holders pivoted to the arm which we used to throw targets from, and at which we shot in the spring of 1883." The date thus assigned was several months prior to both the Stock and Marqua inventions. The witness Eldridge made an affidavit in the Peoria-Cleveland case, September 27, 1890, in which, referring to an affidavit previously made by him in the Peoria-Standard case, he says: "At the time of making this affidavit I was not certain about the date when I saw the traps and glass birds like Photograph A and at first refused to name any date to either Hebbard or his attorney, but Hebbard said it was in 1883, and not having any other date to go by, I stated in my affidavit 'I think this was in the spring of 1883.' Since making that affidavit I have refreshed my memory on the subject and I am now able to say positively that it was in 1884 and

not in 1883 that I first saw this trap like Photograph A." Now it is established beyond controversy by the evidence, and the Hebbard brothers and Dow in their testimony both in the Peoria-Standard case and in this suit admit, that "Hebbard Photograph A" was not taken before the spring of 1884. This gross misstatement of date by these three witnesses on a vital point required a satisfactory explanation. No such explanation has been given. Dow in his affidavit makes two other assertions that demand attention. He says, referring to a trap containing a pivoted carrier, shown in exhibit "Hebbard Photograph B": "In April, 1884, I went with Mr. Albert H. Hebbard to Louisville, and we exhibited the trap and target again to the shooters of Louisville. I am certain of this date because I was married in February, 1884, and I know my wife accompanied me on the trip in April." Here is a positive and circumstantial statement of date. In his testimony in the Peoria-Standard case, in reply to a question whether he had any correction to make with respect to the date of his visit to Louisville as given in his affidavit, he says: "I have; well I simply made a mistake in the date of my marriage. I thought that I was married in February, 1884, as also did my wife, but upon looking afterward at some letters that I had received from numerous friends on that occasion, and which I have now, I find that it was 1885 instead of 1884." His wife did not testify. He further says in his affidavit: "I know that all the different forms of construction made by Albert Hebbard of his throwing apparatus had the target holder pivoted to the throwing-arm; he never made any other way." In his testimony in the Peoria-Standard case he states that he thinks that the "pie-fork" had pivotal action on the end of the sending-arm. In the present case, referring to the "pie-fork," he testifies: "My impression is that it was riveted in some way. * * * It did not have that wrist motion; rigid, I expect." There are other inconsistencies and self-contradictions on the part of these three witnesses to which it is unnecessary particularly to refer. The foregoing instances are enough to show that their testimony is of a generally unreliable character and justly to cause some suspicion to attach to it. Further, there are certain facts disclosed in the case which render it in the highest degree improbable that any one of these three men had any conception of a pivoted target carrier before the latter part of November, 1883. The first Hebbard patent for trap mechanism including such a carrier was No. 322,714, dated July 21, 1885, issued to A. H. Hebbard. The date of the application was May 19, 1885. If a pivoted carrier was invented by Hebbard in 1882, it is difficult, if not impossible, satisfactorily to explain the delay in filing the application. If it was not invented in 1882 there is no evidence showing its subsequent invention prior to the date of Marqua's invention. A. H. Hebbard received letters patent No. 299,783, dated June 3, 1884, for "improvements in flying targets." The application was filed November 23, 1883. In the description he states:

"In the drawings, A represents the trap or 'sender.' * * * I do not wish to be understood as confining myself to the particular construction herein shown, as the objects of my invention may be obtained by other forms of construc-

tion in which the periphery of the concave disk rolls on an arm and the journals slide for the purpose of imparting an axial rotation."

A pivoted carrier is neither disclosed nor suggested by the specification or drawings. If Hebbard had prior to the filing of this application invented a pivoted carrier, it is remarkable that he should not, in view of the fact that he describes not only the target but also trap mechanism, have applied for a patent covering the pivotal feature of the carrier. The evidence shows that both of the Hebbards are intelligent men fully competent to understand the character and scope of the flying target patent. Charles C. Hebbard wrote to F. A. Fouts, a patent solicitor, December 13, 1883, relative to the target invention, as follows:

"We have yours of the 8th inst., containing notice that the patent for flying target had been allowed. We are very much pleased with the manner you have conducted our applications for patents, as we had no idea you would get the target application through without modifying the claims. We think you have obtained very strong claims."

A. H. Hebbard, in his affidavit in the Peoria-Standard case, referring to the above patent, says:

"The patent drawing was made in Washington under the direction of my patent solicitor, Mr. Frank A. Fouts, from a sketch I sent to him. I cannot say for certain now whether that sketch showed the clip pivoted to an arm, but I think it did. When the papers came back to me to be sworn to before filing, there was no drawing with them, and I never saw the drawing until the patent was issued. I was not acquainted with the work of procuring patents, and did not give the papers that attention; I should now, after my experience in such matters."

Charles C. Hebbard, in his affidavit in the same case, says:

"When the patent was applied for, I wrote the letter to the solicitor describing the clip and enclosing a sketch of it made by my brother. I am quite sure that the sketch sent showed the clip pivoted to an arm, but it may not have shown it; but my letter to him described the clip as swinging around when the throwing arm was arrested. When the papers were sent to us by the solicitor, there was no drawing with them, and the fact that the clip was not described as being pivoted to the arm was not noticed. In fact, we did not consider the fact that the clip was pivoted to the arm the essential feature of the invention. The holding of the target in a clip was to us the chief feature," &c.

The letter to Fouts, above referred to, is of much importance in this connection, and is as follows:

"Oct. 8th, 1883.

Frank A. Fouts, Esq.,
    Washington, D. C.

Dear Sir:—We inclose you drawings for an improvement in flying targets and will give you the best description we can and will let you put in shape. By getting a copy of Ligowsky patent, No. 231,919, you will observe that he claims a concave slotted flying target, with a detachable tongue, etc. Now, what we want to do is to patent an article that does away with the slot in the periphery and the detachable tongue, etc., at the same time is cheaper and overcomes the weak points as described in the newspaper cutting attached. To accomplish this we make a circular disk, either singular or double concave, provided with hubs or axles, at or near its center, preferably of the same material as the disk. These hubs or axles are for the purpose of holding the periphery of target when placed in the suitable trap or sender in such manner that when force is applied to project it therefrom, will give the target a spinning or axial rotation that will cause its flight to resemble that of a bird. The lower hub or axle projecting below the base of disk will also protect the target from break-

ing when it descends to the ground. To use the target you will see by refer- ence to the drawing, that it is placed between arm 'A' and the spring jaws, 'B' 'B.' The jaws 'B' 'B' bearing upon the hubs or axles will press the periph- ery of the target firmly against the arm 'A' (which is covered with any soft or elastic material,) so that when the trap is sprung and the arm 'A' swings quickly around and then suddenly arrested, it will cause the hubs to slip on jaws 'B' 'B' and the periphery of target will roll on arm 'A' and when released will give to the target a very rapid spinning motion or axial rotation, that will cause it to float edgewise to the air. We do not wish to limit ourselves to any particular shape or proportions as the features of our invention are attained by any construction that will permit a concave disk to have axial rotation impart- ed to it by means of friction applied to its central hubs or axles or its periphery. You can letter the drawings and describe them much better than we can. En- close find check for $25.

"Yours respectfully,                                    Chas. C. Hebbard."

That the significance of this letter may be fully appreciated it must be read in the light of certain facts briefly to be adverted to. The evidence shows that the various target carriers made by A. H. Hebbard prior to the date of the letter, whether for Saturn targets, tongueless Ligowsky clay targets or targets with central hubs or axles, were so constructed as to impart through unequal frictional resistance axial rotation to the target. Such rotation could be ac- quired when the carrier was rigidly attached to the sending-arm. It could also have been acquired if the carrier had been pivotally connected with the arm. The fact of axial rotation is of itself wholly indeterminate of the mode of attachment of the carrier. The Hebbard brothers and Dow testified that as early as 1882 they recog- nized the importance of having the carrier pivotally attached to the arm. A. H. Hebbard testifies as follows:

"XQ. 384. Did you regard the pivoting of the throwing device to the main arm of the trap as an essential feature of the throwing device as it was con- stituted by you in your constructions in the fall of 1882? A. Yes, I did. XQ. 385. And you so regarded it at that time? A. Yes; we knew that it was nec- essary to have it swing on the end of the arm. * * * XQ. 389. Was it then your opinion in the summer of 1882 that the pivoting of the carrier ma- terially increased the length of throw of the target? A. Yes, it was. * * * XQ. 391. You knew at that time the distinction in the character of the throw obtained by the two devices, the pivoted device and the device attached rigidly; the time I refer to is the period of your experiments in the summer and fall of 1882? A. Yes, I did. XQ. 392. Did you have any thought at all, in the years 1882 or 1883 of applying for a patent for the essential feature of your throw- ing device as you had then constructed it? A. I don't know whether I had or not; I couldn't say positively."

Charles C. Hebbard testifies as follows:

"XQ. 208. Please tell me what the pivoting of that device—second target throwing device—had to do, in your judgment, with the successful throwing of a target without a tongue? A. It had all to do with it, I might say. * * * XQ. 212. You have stated that the pivoting of the device on the throwing arm had all to do with the successful throwing of the tongueless target. Will you please explain definitely what you mean? A. That is my opinion, but others have differed from me at times. The fact that all the traps now on the market have a pivoted throwing device bears out the statement that it is the most successful way of throwing a tongueless target. XQ. 214. What did you do or accomplish in 1882 with this device or with the 'Third Target Throwing De- vice' that the Ligowsky trap did not do? A. We proved to our own minds that we could throw a tongueless target by means of a pivoted carrier, and laid the foundation for all the improvements that have been made since in pivoted carriers, and which are now used by the company you represent."

Dow testifies as follows:

"XQ. 68. When this device—'Hebbard's Third Target-Throwing Device,' was produced, the little brass model I mean, do I correctly understand that you recognized at that time the beneficial results which were obtained by pivoting the device on the throwing-arm so as to obtain this wrist-motion? A. Yes, I did. XQ. 69. What did you understand them to be? A. I understood it to be something that would throw a target better than anything we had ever seen up to that time. * * * XQ. 105. But you were satisfied with the throwing device in the fall of 1882? A. Yes. XQ. 106. Do you know why it was, Mr. Dow, that Mr. Hebbard did not apply in the fall of 1883, or earlier, for a patent on a throwing device instead of one on a target? A. No, I don't know why it was."

Recurring now to the Fouts letter of October 8, 1883, that letter with its enclosed sketch or drawing was intended to and did furnish the data for the preparation of the specification and drawings of the Hebbard flying target patent No. 299,783. It does not bear out the assertion of Charles C. Hebbard that in it he "described the clip as swinging around when the throwing arm was arrested." It contains no such statement. It says that "when the trap is sprung and the arm 'A' swings quickly around and then suddenly arrested, it will cause the hubs to slip," &c. It does not mention the swinging or revolution of a clip or carrier on a pivot. The lettering of the mechanism, whatever it was, disclosed in the drawing, apparently corresponds with the lettering of the drawing accompanying the specification of the target patent; "A" indicating the arm, and "B" "B" that portion of the clip or carrier between which and the arm the target was held. As before observed, a pivoted carrier is neither shown nor indicated by the drawing or specification of the patent. Not only is the letter silent on the subject of a pivoted carrier, but it contains a statement which strongly tends to exclude the idea that the writer had any knowledge of a pivoted carrier. The letter is not confined to a description of the target for which a patent was desired. It deals with trap mechanism from which the target was to be thrown. It describes the mechanism, but stops short of a pivoted carrier. It states: "We do not wish to limit ourselves to any particular shape or proportions as the features of our invention are attained by any construction that will permit a concave disk to have axial rotation imparted to it by means of friction applied to its central hubs or axles or its periphery." Such a construction, it has been shown, does not require the pivoting of a carrier. Nothing is said about an increase in axial rotation or in the flight of the target resulting from the pivoting of a carrier. If the Hebbard brothers and Dow in 1882 knew of a pivoted carrier and appreciated its importance, as they say they did, why was it that no application was made to have it patented at or before the time of applying for the target patent? There is no satisfactory explanation. To hold that they then possessed that knowledge would be to disregard the laws ordinarily governing human conduct. Why was it that Charles C. Hebbard, when he undertook in the Fouts letter of October 8, 1883, to describe trap mechanism, did not go further and disclose a pivoted carrier? This omission possibly might have been accounted for on the hypothesis that the Hebbards were unwilling to disclose

to any one an unpatented invention regarded by them as having great value. But such an hypothesis is in direct conflict with the statements of both of them. A. H. Hebbard, in his affidavit in the Peoria-Standard case, said in reference to the drawing inclosed in the Fouts letter: "I cannot say for certain now whether that sketch showed the slip pivoted to an arm, but I think it did." Charles C. Hebbard in his affidavit in the same case said: "I am quite sure that the sketch showed the clip pivoted to an arm, but it may not have shown it." He further says that "when the papers were sent to us by the solicitor, there was no drawing with them, and the fact that the clip was not described as being pivoted to the arm was not noticed." The improbability of the latter statement, on the hypothesis that he and his brother then appreciated the importance of the pivotal feature, is such as to require no comment. It often happens that the gross improbability of an alleged occurrence outweighs and overcomes the affirmative testimony of many witnesses. Especially is this true as to the defence of anticipation in patent suits. Taking the evidence for and against the alleged Hebbard use as a whole, together with all reasonable inferences to be drawn from it, it has not been established clearly, satisfactorily and beyond substantial doubt, that A. H. Hebbard invented a pivoted target carrier prior to the date of Marqua's invention. On the contrary, in view of the vagueness, inconsistencies, self-contradictions and inherent improbabilities disclosed in the evidence in support of the alleged use, and aside from any consideration of bias on the part of some of the witnesses, a preponderance of evidence shows that, while Hebbard prior to the end of July, 1883, constructed carriers capable of imparting axial rotation to targets, he did not until several months after that time have any conception of a pivoted carrier.

The contention that the complainant is estopped from denying that A. H. Hebbard invented a pivoted carrier prior to the date of Marqua's invention, by reason of the fact that in the Peoria-Cleveland case the complainant herein set up by way of defence that Hebbard anticipated Stock's invention, which defence was sustained by the circuit court, clearly cannot be maintained. That case and the present controversy being between different parties, there was no estoppel of record. Nor do the circumstances disclose the essential elements of an estoppel in pais or equitable estoppel. It does not appear that the defendant has been led to incur any expense or assume any liability on account of the attitude of the Cleveland Target Company in that case. It is true that there is some inconsistency between the position taken by the complainant in this suit and the Peoria-Cleveland case respectively. But this inconsistency does not indicate fraud or want of good faith. In the former case the complainant herein was standing on the defensive and had a right to seek the judgment of the court on the evidence, by no means insignificant, tending to show priority of invention by Hebbard. To raise that question did not involve unfair dealing. Nor does it display inequitable conduct on the part of the complainant on the evidence in this case to deny priority of invention by Heb-

bard. The defence based on failure to disclaim cannot be sustained. The conclusion reached as to the alleged Hebbard use and also as to estoppel negatives the existence of any obligation on the part of the complainant to enter a disclaimer as to any of the Marqua claims.

On the question of infringement it is important to assign to Marqua's invention its proper rank. Its distinctive feature is the pivoting of a target carrier on the end of a sending-arm in such manner as to impart to the target at the moment of its disengagement increased axial rotation substantially in the plane of motion of the arm and increased projectile velocity. He was the first to accomplish this result. His invention constituted a distinct, substantial and important advance in the art. With respect to its pivotal feature his was a pioneer invention. In Westinghouse v. Brake Co., 170 U. S. 537, 561, 568, 18 Sup. Ct. 718, 723, the court said:

"To what liberality of construction these claims are entitled depends to a certain extent upon the character of the invention, and whether it is what is termed in ordinary parlance a 'pioneer.' This word, although used somewhat loosely, is commonly understood to denote a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before. * * * We have no desire to qualify the repeated expressions of this court to the effect that, where the invention is functional, and the defendant's device differs from that of the patentee only in form, or in a rearrangement of the same elements of a combination, he would be adjudged an infringer, even if, in certain particulars, his device be an improvement upon that of the patentee."

In Miller v. Manufacturing Co., 151 U. S. 186, 207, 14 Sup. Ct. 318, the court said:

"The range of equivalents depends upon the extent and nature of the invention. If the invention is broad or primary in its character, the range of equivalents will be correspondingly broad, under the liberal construction which the courts give to such inventions."

The character of the Marqua invention is such as to entitle the claims of the patent to considerable liberality of construction. The charge of infringement has been restricted to claims 2, 3 and 5. Claim 2 is as follows:

"2. In a trap or sending apparatus for flying targets, a sending-arm provided with a pivoted extension carrying the target, and having an independent rotation by centrifugal force, in combination with target holding and releasing mechanism automatically actuated to release the target at the moment of extreme extension of the sending-arm, substantially as set forth."

The elements forming the combination covered by this claim are, first, a sending-arm, second, a pivoted extension carrying the target and having an independent rotation by centrifugal force, and, third, target holding and releasing mechanism automatically actuated to release the target at the moment of extreme extension of the sending-arm. The alleged infringing device clearly discloses the first two elements of the claim. Does it disclose the third element? The defendant contends that the target holder in its device is not "automatically actuated" to permit the escape of the target, and, further, that its device, while including target holding mechanism, does not embrace target "releasing" mechanism. It is unnecessary,

even were it practicable, to undertake an exact definition of the phrase "automatically actuated" as applicable to mechanical devices. In common parlance the terms "automatic" and "automatically actuated" mean self-acting, but as usually employed have not such a restricted signification as is claimed by the defendant. The disengagement of the target either from the defendant's device or the Marqua carrier is not a direct, but only an indirect, effect of the application of the force by which the trap is set in motion. In either case the escape of the target is dependent on the pivotal swing of the carrier relatively to the line of the sending-arm and results from the action or movement of parts in the swinging carrier. The fact that the target is disengaged from the defendant's carrier by forcing apart its jaws or fingers under the action of centrifugal force, while it escapes from the Marqua carrier through the raising of a tooth or trigger from its upper surface or the turning of the clasping-arms on an elliptical or otherwise elongated stud does not justify the contention that the mechanism in the latter case is automatically actuated and in the former is not. In the Ligowsky trap patent, No. 252,230, it is stated that "when the sweeping motion of the lever has attained its maximum velocity the tongue of the target is automatically disengaged from the clamp r' s'." Yet in the Ligowsky device the target releases itself by dragging its tongue out of the spring clamp. The term "automatic" is constantly applied to valves, although their action depends on the pressure of liquids or other fluids against them. So the operation of automatic car couplers is dependent on the action on them of the parts to be coupled. In Westinghouse v. Brake Co., 170 U. S. 537, 545, 18 Sup. Ct. 711, the court speaking of car-brake couplings said:

"These couplings were automatically detachable; that is, while they kept their grip upon each other under the ordinary strains incident to the running of the train, they would readily pull apart under unusual strains, as when the car coupling broke and the train pulled in two."

It is unnecessary to multiply instances. The defendant's target holder is clearly automatically actuated to permit the escape of the target. It also contains target releasing mechanism. The distinction between mechanism automatically actuated to release a target and mechanism automatically actuated to allow a target to release itself is unsubstantial. In either case the target is released. While Marqua showed in the drawings and specification of his patent two forms of his invention, his monopoly was not confined to the specific devices described, but included equivalent combinations of parts operating on the same principle and substantially in the same manner. Claim 2 must be held to have been infringed by the defendant's device, unless the contention now to be noticed can be sustained. It is urged that Marqua contemplated the disengagement of the target through a sudden arrest, partial or total, of the sending-arm, the pivotal movement of the carrier taking place at the instant of such arrest; that his claims should be so read as to include this idea; and that the disengagement of the target from the defendant's trap is effected on a different principle, the target

being released by centrifugal force alone and independently of the arrest of the sending-arm. It is further urged that claim 1 clearly requires the arrest of the sending-arm for the disengagement of the target and that, unles the other claims be so considered as to include the same requirement, there has been a misjoinder. Several claims for the same mechanical invention as employed in different modes may properly be joined. The fundamental conception embodied in Marqua's invention is a combination of parts co-operating in such manner that the projectile velocity and axial rotation of the target in the proper plane, when entering upon its flight, are the resultant of the sweep of the sending-arm and the partial revolution of the target carrier on its pivot. And in order to secure a high degree of projectile velocity and axial rotation for the target, the patent requires that its disengagement shall occur approximately at the instant the end of the sending-arm shall have attained its greatest velocity and when the pivotal swing of the carrier shall have brought it into line with the sending-arm as an extension thereof. Marqua may not be technically accurate in his references to natural laws, but the specification and drawings clearly disclose the nature and operation of his invention. He was not so much concerned with scientific nomenclature as with practical results. In the description he states that "in the drawings A designates the ordinary sending-arm of a trap, the latter being of any approved construction, and requiring here no special illustration or description." In claim 1 he restricts himself to a combination in which the target carrier "by the motion and arrest of the sending-arm, is independently rotated upon its pivot by centrifugal force into a position elongating the main arm, and projects the target by a sudden rotary impulse." Claim 2 contains no such restriction in terms. There the carrier has "an independent rotation by centrifugal force" and releases the target "at the moment of extreme extension of the sending-arm" independently of any arrest thereof. Had claim 1 not referred to an arrest of the arm, the argument drawn from the description that such an arrest should be read into all the claims would have had much greater force. But in view of the fact that Marqua, while incorporating such a requirement in claim 1 omitted it from all the others, and especially from claim 2, it is inadmissible to suppose that he intended so to restrict the scope of claim 2. Marqua did not contemplate an instantaneous and total arrest of the sending-arm at the point of its maximum velocity. Such an arrest would have broken or endangered the trap mechanism. He first used his invention on the arm of a Ligowsky trap. Ligowsky in his trap patent describes the sweep of the arm as being gradually arrested. He says: "The moment this maximum velocity has been reached the further sweep of the lever is gradually arrested on its own coil p, thereby preventing a violent jar or concussion, and thus obviating the breakage of the target." Nor did Marqua contemplate that the pivotal swing of the carrier should result solely from either a sudden or gradual stoppage of the arm. On the contrary he states in the description that "by the swinging of the main arm the carrier is impelled by its own centrifugal force to rotate upon its pivot in

the same general plane and direction." By varying the tension of the spring-washer w, shown in Figs. 1 and 2, Marqua's invention will permit the disengagement of the target at or immediately before the moment the end of the sending-arm reaches the point of its greatest velocity, or prevent its escape until the arrest of the arm, as may be desired. The difference between the operation of the invention where the target is released before and where it is released after the partial arrest of the arm is more apparent than real. In either case the target escapes practically at the instant the arm has attained its greatest velocity. In either case the velocity and rotation of the target are the resultant of the sweep of the arm and the pivotal swing of the carrier. Whether by a partial arrest of the arm before the disengagement of the target its rotation is increased at the expense of its projectile velocity is problematical. Possibly the degree of tension of the spring washer might affect the result. Marqua had knowledge of the Fischer trap. He examined the one from which Fischer targets were thrown July 4, 1883. There is no direct evidence showing whether the target escaped from the Fischer trap before or after the arrest of the sending-arm. But it may fairly be inferred from the trap construction shown in the Fischer target patent, No. 281,183, that the target was disengaged before such arrest. Fischer describes the target as rolling on the guide-way b', and being guided by it "until it leaves the case." If the arm were sensibly arrested before the escape of the target from the case the periphery of the target could hardly fail to leave the guide-way before emerging from the case. Undoubtedly Marqua contemplated a use of his invention in such manner that the target would be disengaged after the partial arrest of the sending-arm. The description and claim 1 show this. But there can be little doubt that he also contemplated that his invention might be so used that the target would be released without such arrest. Otherwise it would be difficult, if not impossible, to explain the presence of claim 2. In view of the foregoing considerations an arrest of the sending-arm cannot be read into that claim, nor can it be held that there is a misjoinder of claims. Claim 3 is as follows:

"3. In a sending apparatus for flying targets, in combination with a pivoted sending-arm having a pivoted target-carrying extension, a spring-catch adapted to hold the target and release the same automatically at the proper instant of time, as set forth."

The elements in this combination are, first, a pivoted sending-arm, second, a pivoted target carrying extension, and, third, a spring-catch adapted to hold the target and release the same automatically at the proper instant of time. The defendant's trap discloses the first two elements. Does it contain a spring-catch? In Figs. 1 and 2 of the Marqua patent the spring-catch consists of a trigger-arm provided with a tooth F, which is pressed against the upper surface of the target by the action of the spring S, and holds the target and automatically releases it at the proper moment. In Figs. 3 and 4 the resilient clasping-arms G G perform the same function. In the defendant's device the spring S causes the target to be caught between the arms of the carrier, where it is held and at the proper

moment automatically released. The arms of the carrier in connection with the spring constitute the spring-catch and perform the same function as the spring-catch in the Marqua invention. In each case the catching or clasping device is intended to prevent the disengagement of the target under the action of centrifugal force until "the proper instant of time," namely, the moment the sending-arm is approximately at the point of its maximum velocity. Within the scope of equivalency as applicable to a patent of the character of that in suit the defendant's device must be held to contain the spring-catch of claim 3. Claim 5 is as follows:

"5. In a target-sending apparatus, the combination of the main arm A and pivoted extension B, provided with automatic holding and releasing devices, with the adjustable spring-washer w, for regulating the frictional resistance to centrifugal action of the carrier, substantially as set forth."

Here the elements are, first, a sending-arm, second, a pivoted extension provided with automatic holding and releasing devices, and, third, the adjustable spring-washer w, for regulating the frictional resistance to centrifugal action of the carrier. It is contended that the alleged infringing device does not disclose such a spring-washer. It is admitted that it contains a spring-washer w, but it is claimed that its function is not to regulate frictional resistance to the pivotal swing of the carrier under the action of centrifugal force, but merely to secure a smoothly working joint. The most effective pivotal swing of the carrier is obtained where it occurs during the latter part of the onward sweep of the sending-arm and when the arm is comparatively near the point of its maximum velocity. The function of the spring-washer in Marqua's invention is to prevent too early an outward swing of the carrier during the sweep of the sending-arm. By checking or delaying pivotal action of the carrier until the arm has attained great velocity, its terminal swing will be both more sudden and rapid, resulting in increased projectile velocity and rotation of the target. It is admitted that the defendant's spring-washer can be used for regulating frictional resistance to the pivotal swing of the carrier, but it is denied that it is so used. It is an adjustable spring-washer, however, and any one using the defendant's trap can, at will and without the least difficulty, by employing the means furnished by the defendant, regulate the tension in such manner as to cause the spring-washer to offer frictional resistance to the swing of the carrier under the action of centrifugal force. The complainant's expert on this point makes the following statement which is wholly uncontradicted:

"These screw-threaded pivots upon which the pivoted extensions turn are provided with check-nuts, so that when they are adjusted to any desired amount of tension of the spring-washers, these check-nuts will, by screwing them up against the underside of the outer ends of the sending-arms immovably secure such pivots in the desired positions for the spring-washers to offer the desired resistance to the centrifugal action of the carrier."

The bill must be sustained in so far as it charges infringement of claims 2, 3 and 5 of the Marqua patent.

The charge of infringement as to the Hebbard patent No. 371,839, is confined to claim 1, which is as follows:

"1. In a trap for flying targets, the combination of a V-shaped frame of sheet spring metal pivoted to the throwing-arm at its apex, a strip secured above one arm of the frame in a plane parallel to the same, a hook, and a spring-actuated stud provided with a yielding sleeve upon the other arm, as and for the purpose shown and set forth."

In view of the prior state of the art and particularly of the Hebbard patent No. 322,714, and Holz patent No. 330,704, if the Hebbard patent in suit can be sustained at all, claim 1 must receive a construction so strictly limiting and confining it to the specific device described in the specification and shown in the drawings as to avoid the charge of infringement.

Let a decree for the complainant be prepared in accordance with this opinion.